CHARLES BASYE v. STATE OF NEBRASKA.

FILED JUNE 18, 1895.    NO. 7277.

1. **Criminal Law**: JURORS: VOIR DIRE EXAMINATION: REVIEW.
Upon the *voir dire* examination of a venire-man the trial court
should exercise a sound discretion, not only in respect to the
pertinency of the questions propounded, but as to the limits,
extent, and scope of the examination. In order to constitute
prejudicial error a clear abuse of discretion must be shown.

2. ———: ———: ———. On the examination of a juror on his
*voir dire* each party has the right, within reasonable limits, to
put pertinent questions for the purpose of ascertaining whether
or not there exist sufficient grounds for a challenge for cause,
and also to enable the party to properly exercise his statutory
right of peremptory challenge.

3. ———: ———: ———: REVIEW. During the impaneling of the
jury in a prosecution for murder, counsel for the accused pro-
pounded to several jurors, who had read newspaper accounts of
the killing, this question: "Have you formed any opinion or
conclusion in your own mind as to whether or not the defendant
was guilty, or whether or not the crime of murder had been com-
mitted?" The county attorney objected as not a proper *voir
dire* question, which objection was sustained by the trial court.
*Held*, Error.

4. ———: WITNESSES. Under the statutes of this state the defend-
ant is a competent witness in his own behalf. His interest in the
result of the trial may be shown for the purpose of affecting his
credibility.

5. ———: EXAMINATION OF JURORS. In impaneling a jury in a
criminal case it is proper to ask a juror whether the fact that
the defendant is charged with a crime would have any weight
with the juror, and whether he could give the same credit to the
testimony of the accused, should he testify in his own behalf,
that he could give to the testimony of any other witness, under
the same circumstances.

6. **Qualification of Jurors.** The fact of qualifications of a
juror, when challenged for cause, is to be determined by the
trial court from a consideration of his entire examination and
such other evidence and circumstances as tend to throw light
upon the subject. The appearance and general demeanor of

the juror while being examined may be taken into considera-
tion in determining his competency to serve.

7. ———: CHALLENGES: DECISIONS: REVIEW. The finding of the
trial court, in deciding a challenge for cause, will not be set
aside by the appellate court, unless it is clearly wrong.

8. ———: OPINIONS. Where, upon examination of a juror, it is
shown that he has formed a hypothetical opinion, founded solely
upon rumor and reading of newspaper reports, and that such
opinion will not interfere with his rendering a fair and impar-
tial verdict upon the evidence under the instructions of the
court, he is not disqualified to sit in the case.

9. ———: ———. An opinion formed by a juror does not affect his
competency, or afford cause for challenge, unless it is unquali-
fied as to the guilt or innocence of the accused of the offense
charged.

10. Information: INDORSEMENT OF NAMES OF WITNESSES. The
indorsement of the surname and the initials of the Christian or
given name of a witness upon an information is a sufficient
compliance with the requirements of the statute which requires
the names of the state's witnesses to be indorsed upon the in-
formation prior to the trial.

11. Murder: EVIDENCE. In a prosecution for murder it is com-
petent for the state to prove the description and location of the
wounds inflicted by the defendant upon the deceased, as tend-
ing to establish whether or not death resulted therefrom.

12. ———: ———. Dying declarations, in order to be admissible,
must have been made under a sense of impending death, and it
is competent for the party offering them to prove the physical
condition of the deceased at the time they were made.

13. Criminal Law: ORDER OF ADMITTING EVIDENCE. The
order in which a party shall introduce his proof is, to a great
extent, discretionary with the trial judge, and the action of the
court in that regard will not be cause for reversal when no
abuse of discretion is shown.

14. ———: CONFESSIONS. A voluntary confession or admission of
guilt made by a prisoner out of court is admissible in evidence
against him.

15. ———: ———. Held, That sufficient foundation was laid for
the admission of that class of testimony in this case.

16. Attorney and Client: PRIVILEGED COMMUNICATIONS. A
communication from a party to an attorney is not privileged

where the relation of attorney and client did not exist between them.

17. ———: ———: DISCLOSURE IN EVIDENCE BY THIRD PERSONS. While confidential communications between attorney and client are privileged, and neither will the attorney be permitted, nor can the client be compelled, to repeat them, yet where a client makes statements to his counsel in the presence and hearing of a third party who stands in no relation of confidence to either the attorney or client, such person may testify to such statements.

18. **Murder**: REPUTATION OF DEFENDANT: EVIDENCE. On a trial for murder, evidence tending to show the defendant's general reputation as a peaceable and quiet man in the community in which he resided prior to the offense charged is competent, but his reputation for honesty and integrity is not admissible.

19. **Criminal Law**: CHARACTER OF DEFENDANT: EVIDENCE. Where, in a criminal prosecution, the defendant introduces evidence of his good character or general reputation, it is not competent for the state in rebuttal to put in evidence particular facts or rumors tending to prove it to be bad.

20. ———: ———: ———. It is permissible on cross-examination of a witness testifying in reference to character or reputation, to ascertain the extent of his information, the foundation for his opinion or the data from which he draws his conclusion; and upon such examination he may be asked, with a view to lessen the effect of his testimony as to general reputation, but not for the purpose of establishing the fact to be proved, whether he has not heard certain enumerated reports which tend to contradict the purport and effect of his testimony given on direct examination.

21. **Murder**: SELF-DEFENSE: DISPOSITION OF ACCUSED: EVIDENCE. In a prosecution for murder, where the circumstances tend to establish self-defense, evidence of the quarrelsome and irritable disposition of the deceased, and of threats recently made by him against the accused, which were communicated to the defendant prior to the killing, is admissible.

ERROR to the district court for Saunders county. Tried below before WHEELER, J.

The opinion contains a statement of the case.

*Good & Good* and *J. K. Vandemark*, for plaintiff in error:

The greatest latitude should be permitted in examining jurors to ascertain whether they are biased or prejudiced. The accused should not only be permitted to ask the jurors the direct question as to whether or not they have such bias or prejudice, but should be permitted to ask them any question from which the inference of bias or prejudice may be drawn. (*Monaghan v. Agricultural Fire Ins. Co.*, 18 N. W. Rep. [Mich.], 796; *Chicago & A. R. Co. v. Buttolf,* 66 Ill., 347; 1 Thompson, Trials, sec. 102.)

Error resulted from overruling challenges for cause where the examination showed that jurors had formed opinions as to the guilt of defendant. (*Miller v. State*, 29 Neb., 437; *Curry v. State*, 4 Neb., 550; *Cowan v. State,* 22 Neb., 519; *Olive v. State*, 11 Neb., 20.)

The court erred in sustaining objections to questions propounded to jurors in reference to the consideration to be given the testimony of defendant in case he should testify in his own behalf. (*Heldt v. State*, 20 Neb., 492; *Lester v. State*, 2 Tex. App., 432; *State v. McAfee*, 64 N. Car., 339; 1 Thompson, Trials, sec. 103; *People v. Car Soy*, 57 Cal., 102; *Stoots v. State*, 9 N. E. Rep. [Ind.], 380.)

Full names of the witnesses for the state should be indorsed on the information. (*Enewold v. Olsen*, 39 Neb., 59.)

The communication between defendant and his attorney, related by the witness Allen, was privileged and should have been excluded. (Wharton, Criminal Evidence, sec. 496; *Bowers v. State*, 29 O. St., 542.)

The objection to admission of defendant's confession on the ground that there was no foundation laid should have been sustained. (Greenleaf, Evidence [15th ed.], sec. 219; *Dodge v. People*, 4 Neb., 230.)

Evidence of defendant's honesty and integrity was erroneously rejected. (Wharton, Criminal Evidence [8th ed.], sec. 66.)

Defendant should have been permitted to show that deceased was a quarrelsome and irritable man. (Wharton, Criminal Evidence [8th ed.], sec. 72; 2 Thompson, Trials, sec. 2174.)

Defendant offered to prove threats made against him by deceased and the proof was erroneously excluded. (Wharton, Criminal Evidence [8th ed.], sec. 69; *State v. Tarter*, 37 Pac. Rep., [Ore.], 53; *Wiggins v. People*, 93 U. S., 467.)

Where the character of the accused is drawn in question, it is not permissible to show particular facts or acts committed by the accused in collateral matters. (*Olive v. State*, 11 Neb., 1; *Commonwealth v. O'Brien*, 119 Mass., 342; *Patterson v. State*, 41 Neb., 538.)

*A. S. Churchill, Attorney General*, for the state.

Norval, C. J.

At the January, A. D. 1894, term of the district court of Saunders county the plaintiff in error was tried upon an information charging him with murder in the first degree, by having on the 14th day of December, 1893, unlawfully, purposely, and feloniously, and of his deliberate and premeditated malice, killed and murdered one William O. Wright. The prisoner was found guilty of murder in the second degree, and thereupon he moved to set aside the verdict, and for a new trial, which motion was overruled, and he was adjudged to be imprisoned in the state penitentiary at hard labor for the term of twenty years, from which judgment and sentence he prosecutes a petition in error to this court.

The evidence contained in the bill of exceptions is quite voluminous, and it is not deemed necessary that we set out or discuss all the details thereof. For a proper understanding of some of the questions presented for review a brief statement of the facts disclosed by the record may not be out of place. From the evidence on the trial it appears that

the plaintiff in error and the deceased resided in the town of Valparaiso, in this state, and at the time of the unfortunate tragedy they lived upon the same block. Basye was a single man, engaged in repairing and painting buggies, and roomed over his shop. On the morning of the 14th of December, 1893, the deceased went to the room of Basye, one D. O. White being present when he entered, but who remained only a short time, but after completing his settlement with Basye he left, leaving deceased and plaintiff in error alone. A few minutes after White left, Basye shot Wright with a shot-gun. The latter died from the effects of the wounds the second night thereafter. Immediately after the shooting, plaintiff in error went upon the street and told the first person he met what he had done. He then went to the law office of C. S. Allen, and soon thereafter was taken into custody. The killing is admitted. The theory of the prosecution is that it was premeditated by the plaintiff in error. The latter denies this, claiming that he fired the fatal shot in self-defense. The record discloses that two days prior to the shooting, Wright caused Basye to be arrested for keeping a house of prostitution, but before a hearing was had the case was compromised and the complaint withdrawn, the defendant paying the costs. The state produced as a witness one Dan F. Riley, who testified that on the evening after the dismissal of the criminal case, Basye, in the presence of the witnesses Denman and Hotchkiss, said, "if he caught Mr. Wright around his place again he would put a load of shot into him." The plaintiff in error, as well as both Denman and Hotchkiss, upon being interrogated upon the witness stand, testified positively that no threat of any kind was made by Basye concerning the deceased at the time and place stated by Riley, but that the only threats made were of and concerning one Barnes. It further appears in evidence that the deceased was indebted to the plaintiff in error in the sum of $10 for painting a buggy, and that upon the day previous

to the shooting the account was presented by Basye's at-
torney to Wright, and payment thereof demanded, and
that the latter, in an angry manner, refused to pay it then,
saying, "he was not done with Basye yet, and that he
would settle with him to-morrow." It was shown by the
testimony of several witnesses that within a few days of
the tragedy the deceased had frequently made threats that
he would run Basye out of town, also that the deceased
had borrowed a revolver of one Barnes, which fact, to-
gether with the threats made by Wright, were communi-
cated to the plaintiff in error the evening preceding the
shooting. The state introduced evidence tending to show
that the deceased left home about 9 o'clock on the morning
the fatal shot was fired, saying he was going to Basye's to
pay him for painting the buggy. The only evidence as to
what took place after he arrived at the place of abode of
the plaintiff in error, and the facts and circumstances sur-
rounding the killing, consists of the dying declarations of
Wright, the testimony of the accused and his admissions
or confessions. At least nine witnesses testified to the
dying declarations of Wright, and their testimony is sub-
stantially the same, and to the effect that the deceased went
over to Basye's rooms to pay him what he owed him, that
he made a tender of the money, that Basye ordered him out
of the room, and as deceased was leaving he shot him.
The plaintiff in error testified that D. O. White came to
his rooms on the morning of the 14th of December to set-
tle an account, and after the business was transacted White
went away, but before he did so Wright, the deceased,
knocked at the door and was admitted by Basye, who
greeted him with "Good morning," asked him in, gave him
a chair and he sat down near the stove. During the five
or six minutes that White remained after Wright arrived
there was no other conversation between Basye and the de-
ceased. The foregoing testimony of the plaintiff in error
is fully corroborated in every particular by the evidence of

White, who was a witness in behalf of the state. The accused further testified that when White went away he (witness) put on his overcoat and overshoes, and then turned to the deceased and asked him what he was going to do about the buggy. To this inquiry the deceased replied by asking Basye what he was going to do, and the latter answered he did not know, that his lawyer had advised him to go and get the buggy and put it in the shop; that " Wright jumped up then where he was, holding the chair in his hand, and spoke in a very violent manner to me and said, 'I will be God-damned if you will. I would like to see either you or your lawyer get that buggy,' and then he grabbed up a piece of a chunk and commenced to shake it over my head. At that time I started to get to the door. I backed myself over very near the door, and he was backing over towards the door too, and he started to put his hand back on his hip, or made an effort to do that as he was going out, and I did not think it was right for him to go on that way, and he made an effort to strike me. I stepped back and picked up the poker, whereupon the deceased made a motion at me with something in his hand and says, 'You drop that or I will drop you,' and I done so. I stepped back a few steps and the thought occurred to me, and I reached around the corner and got my gun. I brought it around in front of me to a guard. To bring it to a guard is to bring the gun in front in a motion ready to fire. I told him to get out of the room. I told him that repeatedly. I repeated that three or four times and told him to keep his hands up. He stepped out in the hall and remained there. Well, he says to me, 'I have papers to serve on you, and I am going to serve them on you,' and he smacked his hand around over his hip pocket, and I throwed the gun up and she went off." There was likewise introduced on the trial evidence tending to show that Basye was a person of small stature, peaceable, quiet and inoffensive, and that the deceased was a large, strong man.

There are other circumstances appearing in the proofs introduced tending to strengthen the theory of the prosecution, and also that of the defense, which we will not set out.

· The petition in error contains eighty-three assignments of error, several of which are not urged in the argument, and it is not deemed necessary that we notice or consider all the exceptions relied upon by the prisoner in his brief, but only the most important questions arising upon the record will receive attention at our hands.

J. E. Reed, Alvin Tracy, and Barney Schroeder were separately called and examined both by counsel for the state and the accused touching their qualifications to sit as jurors in the cause. During such examination it was disclosed that each had read newspaper accounts or statements of the tragedy, and thereupon to each was propounded by defendant's counsel the following question: "Have you formed any opinion or conclusion in your own mind as to whether or not the defendant was guilty, or whether or not the crime of murder had been committed?" The county attorney objected as not a proper *voir dire* question, which objection was sustained by the court, and exception was taken by the defendant. Of this ruling he now complains, and is made the basis of the sixth, tenth, and sixteenth assignments of error. We think the question propounded to the jurors was pertinent and proper and they should have been allowed to answer it. One object of the *voir dire* examination is to ascertain whether the mind of the venire-man is entirely free from bias, or prejudice, and whether he would make a competent juror. But the purpose of such examination is not alone to ascertain whether sufficient grounds for challenge for cause exist, but as well to enable the accused to properly exercise his right to challenge peremptorily. For the purpose of ascertaining the real condition of the mind of the venire-man, a wide range of inquiry is generally permissible. The court should always exercise a

sound legal discretion in respect to the pertinency of the
question put to the juror, as well as to the limits to which
the examination shall be extended.   To constitute prejudi-
cial error it must clearly appear that there has been an
abuse of discretion in refusing to allow questions to be an-
swered.   In 1 Thompson, Trials, sec. 101, the author says:
"Within reasonable limits, each party has a right to put
pertinent questions to show, not only that there exist
proper grounds for a challenge for cause, but to elicit facts
to enable him to decide whether or not he will exercise his
right to peremptory challenge."   The supreme court of
Michigan, speaking through Judge Champlin, in *Mona-
ghan v. Agricultural Fire Ins. Co.*, 18 N. W. Rep., 797,
in passing upon the scope of a *voir dire* examination uses
this language: "It is the evident intent of the law to se-
cure a jury that shall come to the consideration of the case
unaffected by any previous judgment, opinion, or bias, with
respect either to the parties or subject-matter in contro-
versy, and it is important to the rights of parties that they
may be permitted inquiries which may be the means of
discovering facts which will justify the exclusion of a juror.
The success of a challenge depends upon eliciting such in-
formation from the juror himself, as well as from other
sources, as to his state or condition of mind, as will enable
a judgment to be formed by the court as to his competency.
For this purpose the law subjects the juror to an examina-
tion on oath, when questions are put to test his competency.
If the juror had been permitted to answer the question, and
he had replied that he would, in the case put, lean in favor
of the plaintiff or against the defendant, can it be doubted
that he could have been challenged for cause?   He would
have shown himself to have been disqualified, and no state-
ment from him that he could render an impartial verdict
would have removed the disqualification.   *  *  *  A
party has a right to a certain number of peremptory chal-
lenges, and in order to exercise this right understandingly

it is proper for him to ascertain as nearly as practicable the disposition of the juror towards him, and towards the subject-matter in controversy; and any inquiry within reasonable limits which tends to bring to light any bias or prejudice entertained by a juror is proper." The doctrine is sustained by *Chicago & A. R. Co. v. Buttolf*, 66 Ill., 347; *Watson v. Whitney*, 23 Cal., 376; *State v. Godfrey*, Brayt. [Vt.], 170; *People v. Car Soy*, 57 Cal., 102; *State v. Bresland*, 61 N. W. Rep. [Minn.], 450. There is no room for doubt that the question above indicated which was asked the jurors in this case was proper, at least, for the purpose of determining whether the accused would challenge peremptorily the several jurors, and the trial court erred in sustaining the state's objection to said question.

Upon the *voir dire* examination of the venire-men Olmstead, Francis, and Schroeder the defendant's counsel asked each in substance the following question: "Would the mere fact that the defendant is charged with the commission of a crime have any weight with you, and could you give the same credit to his testimony, were he to go upon the stand, his interest in the result of the suit taken into consideration, that you could give to any other witness?" Complaint is made to the sustaining by the court below of the state's objection to the question quoted. By section 473 of the Criminal Code it is provided: "No person shall be disqualified as a witness in any criminal prosecution, by reason of his interest in the event of the same, as a party or otherwise, or by reason of his conviction of any crime, but such interest or conviction may be shown for the purpose of affecting his credibility. In the trial of all indictments, complaints, and other proceedings against persons charged with the commission of crimes or offenses, the person so charged shall, at his own request, but not otherwise, be deemed a competent witness; nor shall the neglect or refusal to testify create any presumption against him, nor shall any reference be made to, nor any comment

upon, such neglect or refusal." At common law a person prosecuted for a crime was disqualified from testifying as a witness; but in this state the rule is changed by the statute above set out. Here the defendant in a criminal prosecution may voluntarily take the witness stand and testify, but he cannot be compelled to do so. His interest in the result of the trial may be considered by the jury in determining his credibility and the weight that should be given his testimony. The purpose of the putting of the foregoing question to the jurors was to elicit whether or not the fact that the defendant was accused of crime would militate against him, and whether they could give the same credence, or weight, to his testimony as to that of any other person similarly situated. In other words, it was asked to enable the defendant to determine whether the jurors could sit in the trial of the cause without any bias or prejudice against him, and if it were disclosed that they could not, that he might challenge them peremptorily, if not for cause. The question was within the scope of a legitimate *voir dire* examination. (*Lester v. State*, 2 Tex. App., 432; *State v. McAffee*, 64 N. Car., 339; *People v. Car Soy*, 57 Cal, 102; *Stoots v. State*, 9 N. E. Rep. [Ind.], 380; 1 Thompson, Trials, sec. 103.)

The defendant challenged for cause the jurors Alvin Tracy and N. P. Baker, which challenges were overruled and the defendant excepted to the ruling of the court. Permitting these two jurors to serve, over the objection of the defendant, is covered by the eighth and twentieth assignments of error. These two assignments present the same question of law, and will therefore be considered together. The testimony of the jurors on their *voir dire* was practically the same, that of Baker being substantially as follows:

Q. You heard of this case at the time of the occurrence?

A. Yes, sir.

Q. Have you read the published statements in the local

papers at the time, or about the time, of the occurrence of this affair?

A. I think that I read one that was published in the county papers at the time, I don't know which, or perhaps both.

Q. Do you recollect now the matters contained in that which you read?

A. Yes, sir.

Q. Did the account which you read purport to give in detail a statement of the facts, or only a general statement of what had occurred?

A. Well, I don't know if I could answer that question now.

Q. Did the account which you read profess or undertake to give the details of the occurrence?

A. Yes, sir; I should suppose so.

Q. Did you from that account form an opinion as to the guilt or innocence of the accused?

A. Yes, sir; I think perhaps I did.

Q. You think you did?

A. I think I did.

Q. Was that opinion you had, and is it of such a character as to require evidence primarily, to remove it, or was it only an impression?

A. I should think it was more of an impression at the time.

Q. That is what it amounted to, an impression?

A. That is all.

Q. Did you talk with persons concerning the matter?

A. I don't know whether I did or not.

Q. Did you talk with any person with whom, from the nature of their conversation, or what he said to you, you might conclude, or did conclude that he knew the facts, or that he simply detailed them to you as hearsay?

A. No, sir; I don't know that I ever did.

22

Q. Is it your belief that you have talked with no person except persons mostly who talked from hearsay?

A. That would be my impression.

Q. Did you from any such conversation form any opinion as to the guilt or innocence of the accused?

A. No, I can't say that I did.

Q. Now, from what you have heard of this case, and read of it, have you now any opinion as to the guilt or innocence of the person charged with this crime?

A. No, I can't say that I have.

Q. Have you any such impression of the matter as would bias or influence your verdict, after you had heard the testimony and instructions of the court to the jury?

A. No, sir; I don't know that I have.

Mr. Baker also testified that he had no acquaintance either with the defendant or the person murdered.

The cross-examination by Mr. Good, on behalf of the defendant, was substantially as follows:

Q. You have read about the case in the local papers, and possibly in the Omaha *Bee?*

A. Yes, sir.

Q. You have heard some talk with reference to the case?

A. Street conversations perhaps.

Q. The conversations which you heard were conversations between persons from Valparaiso, or any of them from Valparaiso or persons in that vicinity?

A. No, sir. I am not acquainted down in Valparaiso. I think was here on the streets among neighbors.

Q. Do you know whether or not the persons with whom you talked, or heard the conversation, related what were the facts, or what were claimed to be the facts in the case?

A. No, I don't know as to that.

Q. From what you heard and what you read did you form any impression as to what verdict ought to be rendered in this case?

A. That would be owing to the reliance I would put upon it.

Q. How much reliance did you put upon it, Mr. Baker?

A. No, sir; I can't say that I put that much reliance on it.

Q. From what you read and what you heard, did you form any belief, or any bias or prejudice for or against the defendant?

A. No, sir.

Q. Are you conscious at this time, Mr. Baker, of any feeling or bias against the defendant?

A. No, sir.

Q. That impression which you then formed you have now?

A. Yes, sir; I suppose I have.

Q. Is the impression which you now have such as would require some evidence to remove or change it?

A. Yes, sir.

Q. The impression which you have is based upon reading the newspapers, and conversations which you have had and heard upon the subject?

A. Yes, sir.

Re-examined by county attorney:

Q. Notwithstanding this impression, Mr. Baker, can you sit here in the trial of this case as a juror, and impartially try the defendant on the evidence, and instructions of the court, and not have any bias by reason of the impression which you state you have of the matter?

A. Yes, sir; I think I could.

The court took the juror in hand and elicited from him the statement that he then had no opinion as to whether the defendant was guilty or not, and that his information in regard to the matter consisted in reading the accounts of the killing published in the *Wasp* and the Omaha *Bee*.

It is insisted that the case at bar falls squarely within

the rule announced by this court in *Miller v. State*, 29
Neb., 437. It was there held, following *Curry v. State*,
4 Neb., 550, *Olive v. State*, 11 Neb., 11, and *Cowan v.
State*, 22 Neb., 519, that "when a person called to serve as
a juror in a criminal case discloses on his *voir dire* that he
has an opinion as to the guilt or innocence of the accused,
based on rumor and the reading of newspaper accounts of
the alleged crime, which will require evidence to remove,
a challenge for cause should be sustained, even though he
states that he thinks he could render an impartial verdict
under the law and evidence." The statute provides, sec-
tion 468 of the Criminal Code, that in a criminal case a
challenge for cause may be made to any person called to
serve as a juror for any of the nine grounds which are
enumerated, the second of which is as follows: "That he
has formed or expressed an opinion as to the guilt or in-
nocence of the accused; *Provided*, That if the juror shall
state that he has formed or expressed an opinion as to the
guilt or innocence of the accused, the court shall thereupon
proceed to examine, on oath, such juror as to the ground
of such opinion; and if it shall appear to have been
founded upon reading newspaper statements, communica-
tions, comments, or reports, or upon rumor, or hearsay, and
not upon conversations with witnesses of the transactions,
or reading reports of their testimony, or hearing them tes-
tify, and the juror shall say on oath that he feels able, not-
withstanding such opinion, to render an impartial verdict
upon the law and the evidence, the court, if satisfied that
said juror is impartial and will render such verdict, may,
in its discretion, admit such juror as competent to serve
in such case." It is very evident that the purpose of
the above provision was to secure to the state and to the
accused a fair, impartial, unprejudiced, and unbiased jury
in criminal prosecutions, one that will decide the case upon
the evidence alone, under the charge of the court, uninflu-
enced by outside considerations. A juror, who upon his

*voir dire* discloses that he is biased or prejudiced, or who has a fixed and settled conviction or opinion as to the guilt or innocence of the defendant based upon mere rumor, or the reading of the public press, or founded upon conversations with witnesses of the transaction, is incompetent to serve, and should be rejected, even though he may upon his examination state that he feels able "to render an impartial verdict upon the law and the evidence." This is the true test of disqualification within the meaning of the statute. If upon the whole examination of the juror it is manifest that the opinion formed by him from reading newspaper accounts of the alleged crime or upon rumor is merely hypothetical, or conditional on the truth of the rumor or the newspaper reports read; that he has no settled opinion as to the guilt or innocence of the accused, and that he can render a fair and impartial verdict upon the evidence adduced on the trial, under the instructions of the court, the juror is competent. (*Murphy v. State*, 15 Neb., 383; *Bohanan v. State*, 18 Neb., 57; *Curry v. State*, 5 Neb., 412.) Under the statutes the mere fact that a juror has formed an opinion from what he has heard or read does not disqualify him from acting, nor make him incompetent to serve as a juror. It is only when the venire-man has such a settled opinion, or the examination shows such a state of mind as will preclude him from returning a true verdict upon the evidence submitted on the trial, that he is disqualified. In other words, he is incompetent if he entertains an unqualified or unconditional opinion on the merits of the case, however formed, or an opinion of that fixed character which repels the presumption of innocence of the prisoner. The statute does not in express terms, nor by fair implication, disqualify one from serving as a juror who has read newspaper reports of the commission of the crime. If it did, in this day and age of almost universal reading of the public press, and where the enterprising newspaper man gathers and publishes the events of the day, it would be almost

impossible to secure a competent jury to try any important criminal case. If from the reading of the reports of the commission of crime in the newspapers there is produced in the mind of the juror a settled conviction that what he has read was true and that he had formed a fixed opinion as to the guilt or innocence of the offense charged, then sufficient grounds for challenge for cause exists, since he would not be an impartial juror. Although it is competent and proper to put to a juror questions to elicit from him whether he could lay aside any opinion formed, and decide the case upon the evidence produced on the trial, yet it is the duty and province of the court, and not of the juror, to pass upon and determine the question of capability and whether or not his opinion disqualifies him to act as a juror. This is the plain import of the language of the statute already quoted. Besides, section 469 of the Criminal Code de-clares: "All challenges for cause shall be tried by the court, on the oath of the person challenged, or on any other evidence," etc. Manifestly, it is the duty of the trial court to decide as to the fact of qualification of the person challenged from a consideration of his entire examination and such other evidence and circumstances as tend to throw light upon the subject. The trial court in determining the fact of qualification is not confined to the answers of the juror alone, but may consider his appearance and general demeanor while undergoing examination. A venire-man might answer that notwithstanding his opinion he could decide the case on the evidence and law, and that he would not be influenced by prior outside information which he has obtained, and yet his examination might disclose facts that contradict this statement. If it did, he is disqualified. The rule for which counsel for the prisoner contends, if carried to its logical conclusion, will prevent most persons from serving as jurors, who have heard or read anything of the purported facts bearing upon the issue to be tried. In *Miller v. State, supra,* it was disclosed that the opinion

formed by the juror from reading newspaper accounts of the crime and from rumor was so fixed that he could not give the defendant a fair and impartial trial, although he honestly believed he could decide the cause upon the testimony alone.   The proper distinction was not drawn in that and some other prior cases in this court between a hypothetical or conditional opinion and an unconditional and fixed one.   A careful perusal of the examinations of the jurors Tracy and Baker discloses that they were not acquainted with either the deceased or the defendant; that they entertained no fixed or settled conviction, if indeed any, as to the guilt or innocence of the accused, but that they could render a fair and impartial verdict according to the evidence.   The challenges for cause to the jurors were properly overruled.

J. D. Hare, William Giffin, and G. R. McCormick were separately called and examined as witnesses on behalf of the state.   The defendant at the time objected to their testifying on the ground that their full Christian names were not written upon the back of the information, the surnames and initials of the Christian names of these witnesses being indorsed thereon.   The identical question thus presented by the twenty-second, fortieth, and forty-first assignments of error was passed upon during the present term in *Perry v. State*, 44 Neb., 414, where it was held that such an indorsement of the names of witnesses upon the information is a sufficient compliance with the requirements of the statute.   No good or sufficient reason having been suggested in the brief of counsel for disturbing the rule announced in the case mentioned, the decision will be followed herein.   Therefore, defendant's objections to the above named witnesses being sworn and examined are not well taken.

Drs. Hare and Guttery, who conducted the *post mortem* examination of the body of Wright, were permitted, over the objections of the defendant, to give a particular and

minute description of the gun shot wounds,—the size, depth, and location of each. These rulings are the foundation of the twenty-third and twenty-fifth assignments. The testimony was clearly material and competent as tending to establish the fact that death resulted from the wounds. The proposition is too plain to require elaboration or argument.

Six assignments of error, the twenty-fourth, twenty-seventh, twenty-eighth, thirty-first, thirty-third, and thirty-sixth, are predicated upon the permitting of as many witnesses called by the state to testify as to the intensity of the pain suffered by the deceased after the wounds were inflicted. It is strenuously argued that this testimony was inadmissible and was prejudicial to the prisoner, for the reason that the jury might infer therefrom that it was proper to consider such testimony in determining the degree of the offense charged. Each of the six witnesses testified to certain dying declarations of the deceased, over the objections of the defendant that no proper foundation had been laid for this class of testimony, in that it was not shown that the party making them at the time believed himself *in extremis*. The competency of dying declarations is a question for the court to determine in view of the circumstances under which they were made. In order to be admissible it is essential that the party offering them establish that they were made under a sense of impending death. (*Rakes v. People*, 2 Neb., 157; *Fitzgerald v. State*, 11 Neb., 577; *Binfield v. State*, 15 Neb., 484.) The physical, as well as mental, condition of the deceased at the time of the making of the declaration is admissible, not only as tending to prove that they were made *in extremis*, but as affecting the weight which should be given them by the jury. While it is true the testimony relating to the degree of pain and suffering of the deceased was introduced after the witnesses had detailed the declarations, yet there should not be a new trial awarded for that reason,

since the order of introducing evidence is discretionary with the trial court. (*Clough v. State*, 7 Neb., 323; *Village of Ponca v. Crawford*, 18 Neb., 551; *McCleneghan v. Reid*, 34 Neb., 472; *Consaul v. Sheldon*, 35 Neb., 247.) The record in the case at bar fails to show that the defendant has been deprived of a substantial right or that there has been an abuse of discretion in the order in which the proofs were put in.

Several assignments of error refer to permitting different witnesses to testify to verbal confessions made by the defendant. Objections were made to the introduction of these admissions or confessions on the ground that no foundation was laid. The record, without the least contradiction, discloses that the confessions proved upon the trial were made on the day of the tragedy, before the defendant was arrested, and under circumstances of so conclusive a nature as to establish beyond controversy that they were voluntary, and without inducement of any kind being held out to the defendant to obtain them. They were made on the defendant's own offer, without question or suggestion, and without the influence of hope or fear, and were therefore admissible. (*Furst v. State*, 31 Neb., 403.)

C. S. Allen, an attorney residing at Valparaiso, testified to a conversation had with the defendant, in which the latter detailed the shooting and the circumstances surrounding the parties at the time. Objection was made by the defendant to this testimony on the ground that the communication was privileged, which was overruled, and the testimony admitted. A reversal is sought on that ground. Subdivision 4, section 328, of the Code of Civil Procedure, provides that testimony cannot be given by "an attorney, concerning any communication made to him by his client in that relation or his advice thereon, without the client's consent in open court or in writing produced in court." Section 333 declares: "No practicing attorney    *    *    *    shall be allowed, in giving testimony, to disclose any con-

fidential communication, properly intrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline." The foregoing provisions have heretofore been considered by this court; and it has been held that any confidential communication made by a party to an attorney is privileged, and cannot be given in evidence unless the client consents thereto. (*Romberg v. Hughes*, 18 Neb., 579; *Nelson v. Becker*, 32 Neb., 99.) In order to entitle one to the protection of the statute which renders the communication to a lawyer privileged it is obvious that the relation of client and attorney must have existed between them. Were the admissions testified to by Mr. Allen made by the defendant in confidential consultation with him as his attorney? This is a question of fact to be determined from the evidence introduced on that issue. It is undisputed that shortly after the shooting the defendant went to the law office of Mr. Allen, where, in the presence of J. K. Vandemark, an attorney of the same town, the conversation in question occurred. It was also shown without contradiction that Mr. Allen had never at any time been employed by the defendant, although on two previous occasions Mr. Basye went to see him to engage him to look after some legal business, but Mr. Allen declined to take the cases or to be retained. The evidence of the latter shows at the time the admissions were made the defendant did not seek his counsel or ask to engage him; that nothing was said from which the inference could be drawn that the accused desired to consult with him; that he gave him no advice, although Mr. Vandemark told him what to do. The testimony of Mr. Vandemark was to the effect that it was the witness' understanding that Basye came to employ Mr. Allen, and that the latter and the witness both counseled him. The evidence is ample to justify the trial court in reaching the conclusion that the relation of attorney and client

did not exist between Allen and the defendant, and that the communication was not made by the latter confidentially to obtain Mr. Allen as his counsel. It is argued that the communication is privileged, since Mr. Vandemark gave advice in the capacity of an attorney, and that Mr. Allen could not disclose the confession, because he happened to be present at the time. Wharton, Criminal Evidence, sec. 496, and *Bowers v. State*, 29 O. St., 542, are cited by counsel in support of their contention. These authorities are not in point. Mr. Wharton, after stating the general rule in regard to communications made by a client to his attorney being privileged, says : " Nor does the privilege cease to operate because a friend was present with the client at the interview." (Wharton, Criminal Evidence [8th ed.], sec. 496.) To the same effect is *Bowers v. State, supra.* The doctrine has no application to the facts in the case at bar. Under the foregoing authorities an attorney will not be permitted to disclose the admissions or communications of his client, against the consent of the latter, because the same were made in the presence of a third party. But it by no means follows that such third party, who was in no way connected with the attorney or client, cannot testify as to such admissions. Neither is the attorney permitted, nor can the client be compelled, to disclose communications or statements made by the latter to the former, but further than this the law affords no protection. Where, at least in the absence of fraud and collusion, a client makes statements to his attorney in the presence of a third party, such person is not prohibited by statute from testifying to such statement. (*State v. Sterrett*, 68 Ia., 76 ; *Jackson v. French*, 3 Wend [N. Y.], 339 ; *Hatton v. Robinson*, 14 Pick. [Mass.], 416 ; *Perry v. State*, 38 Pac. Rep. [Idaho], 655 ; *People v. Buchanan*, 39 N. E. Rep. [N.Y.], 846. It follows from what has been said that the defendant was not entitled to have the statements made by Basye to Allen excluded as a privileged communication.

Upon the trial the defendant offered to prove by two witnesses, D. O. White and James Casement, while they were upon the stand, that his reputation for honesty and integrity was good in the community where he lived. The court excluded the offered testimony, and of which action complaint is now made. The text-books and the adjudicated cases agree that in a criminal trial evidence of the previous good character of the defendant is always admissible as a fact for the jury to consider in determining the question of guilt or innocence. The character the defendant is entitled to prove must be consistent with the offense charged. For instance, in a prosecution for murder his general reputation as a peaceable and quiet man is competent, but not his character for honesty and integrity. Had this prosecution been for larceny, then the offered evidence would have been admissible. (Wharton, Criminal Evidence, sec. 60 and note 3.) Several witnesses were introduced by the defendant who testified to his general reputation as a peaceable and law-abiding citizen. On cross-examination each, over the objection and exception of the defendant, stated that he had heard of the defendant having a quarrel with, and striking, a man several years before while he resided near Raymond. It is argued that under the rule announced in *Olive v. State,* 11 Neb., 1, and *Patterson v. State,* 41 Neb., 538, the admission in evidence on cross-examination of specific facts tending to show the accused's reputation to be bad was erroneous. The precise point here raised was involved in and passed upon by the court in the cases mentioned above, in each of which it was held that the admission of such testimony upon cross-examination was reversible error. In the syllabus in each case it was correctly decided that where a defendant in a criminal case has introduced evidence of his good character or reputation, the state in reply cannot. prove particular facts in order to show it to be bad. This rule is a wise one, for the obvious reason that the accused is not expected to be

prepared to meet a distinct and specific charge. The princi-
ple, however, was not correctly applied to the facts in the
two Nebraska cases. It was upon cross-examination that
the witness was interrogated as to specific matters. While
particular facts are inadmissible in evidence upon direct
examination for the purpose of sustaining or overthrowing
character, yet this doctrine does not extend to cross-exami-
nation. It is firmly settled by the adjudications in this
country that upon cross-examination of a witness who has
testified to general reputation questions may be propounded
for the purpose of eliciting the source of the witness' in-
formation, and particular facts may be called to his atten-
tion, and asked whether he ever heard them. This is
permissible not for the purpose of establishing the truth of
such facts, but to test the witness' credibility, and to en-
able the jury to ascertain the weight to be given to his
testimony. The extent of the cross-examination of a wit-
ness must be left to the discretion of the trial court. The
questions put to the several witnesses were within the scope of
a legitimate cross-examination, and there was no abuse of dis-
cretion in permitting them to be answered. (*State v. Arnold*,
12 Ia., 480; *Oliver v. Pate*, 43 Ind., 132; *People v. Annis*,
13 Mich., 511; *Rex v. Martin*, 6 C. & P. [Eng.], 562;
*Leonard v. Allen*, 11 Cush. [Mass.], 241; *Ingram v. State*,
67 Ala., 67; *Tesney v. State*, 77 Ala., 33; *De Arman v.
State*, 71 Ala., 357; *Jackson v. State*, 78 Ala., 471; *State
v. Jerome*, 33 Conn., 265; *Carpenter v. Blake*, 10 Hun [N.
Y.], 358; Phillips, Evidence, 352; 1 Best, Evidence,
sec. 261.)

Another contention is that the court erred in refusing to
allow the defendant to prove that the deceased was a quar-
relsome and irritable man, and that he had made threats
against the defendant, which were communicated to the ac-
cused the evening prior to the shooting. This evidence
ought to have been received. In a homicide case, where
it is claimed that the killing was in self-defense, evidence

of the quarrelsome disposition of the deceased and the threats are proper elements for the jury to consider in determining whether the defendant was justified in taking the life of the deceased. In *State v. Zellers*, 2 Halst. [N. J. Law], 230*, the court say: "Inasmuch as the distinction between murder and manslaughter depends upon the impulse of the mind with which the act was committed, every circumstance which goes to show the feeling of the parties towards each other may be proper. That temper, which at one time might not be excited, might, under the excitement of other circumstances, be more easily roused, and, therefore, it may be received by the jury to show the state of mind of the parties." In *Brownell v. People*, 38 Mich., 735, Campbell, C. J., speaking for the court, observes: "The defense rested upon the grounds, among others, that Brownell used a pistol to repel an assault which was not only violent in fact, but made by a powerful man of dangerous temper, who had made threats against him. Looking at the case in a common-sense light, we cannot avoid seeing that any person would naturally be more in fear of a man of that sort than of a quiet or weaker man, and would, in case of an attack from him, feel a greater need of extreme measures to protect himself, and resist his adversary. Inasmuch as every one finds his excuse in facts as they honestly appear to him, such important facts as these cannot be disregarded." *State v. Tackett*, 1 Hawks [N. Car.], 210, was a prosecution for the crime of murder. The defendant set up self-defense. The supreme court on a review of the case uses this language: "If the general behavior of the deceased was marked with turbulence and insolence, it might, in connection with the threats, quarrels, and existing causes of resentment he had against the prisoner, increase the probability that the latter had acted under strong and legal provocation." In *State v. Tarter*, 37 Pac. Rep. [Ore.], 53, the supreme court of Oregon say: "Where the circumstances raise a question of self-defense,

evidence of uncommunicated threats, recently made, are admissible for the purpose of showing the motive of the deceased and the nature and character of the assault. So, also, proof of threats not communicated is often admitted for the purpose of corroborating evidence of those communicated; and likewise, where it is doubtful from the evidence which party commenced the affray, communicated threats are admissible to show who was probably the first assailant." As sustaining the doctrine that the character and disposition of the deceased, and the threats made by him against the prisoner, were admissible in evidence see Wharton Criminal Evidence, secs. 72–78, and cases there cited; 2 Thompson, Trials, secs. 2173, 2174, and cases cited; *Hurd v. People*, 25 Mich., 405. It is true that more than one witness for the defense did testify to threats made by the deceased, but that is no reason why the witness Espy should not have been permitted to detail other similar threats which he heard the deceased utter concerning the accused recently before the tragedy.

There are errors alleged upon the admission and exclusion of testimony, but as they are not likely to be repeated upon another trial, they will not be considered by us. So, too, the giving of a number of instructions, as well as the refusal of the defendant's request to charge, are assigned as error, but we will not stop to review them, although an examination shows that some of the instructions given on the subject of self-defense were erroneous. We do not, however, place a reversal upon that ground. For the errors already indicated the judgment is reversed, and the cause remanded.

REVERSED AND REMANDED.