ROY MAYNARD V. STATE OF NEBRASKA.

FILED APRIL 10, 1908.    No. 15,487.

1. Criminal Law: TRIAL: EXCLUDING WITNESSES. In a trial of a
criminal case where the accused is charged with a felony, it is
the duty of the court in the exercise of its discretion, upon
request, to exclude from the courtroom all witnesses for the state
not being examined; but in the absence of a showing of abuse of
discretion, or a prejudice to the accused on trial, a judgment of
conviction will not, for that reason alone, be reversed.

2. ———: WITNESSES: EXAMINATION BY COURT. While it is the right
of a trial judge in the exercise of a sound discretion to interro-
gate witnesses on a trial of a criminal case when essential to the
administration of justice, yet the practice of so doing should be
discouraged. Should the discretion be abused, or prejudice to
the accused be shown by the record to have resulted, a new trial
should be granted. But a judgment of conviction will not be
set aside for that reason in the absence of a showing of such
abuse or prejudice.

3. ———: INSTRUCTIONS: PREJUDICE. Where, in the trial of an ac-
cused charged with the commission of a felony, there were a
large number of instructions given to the trial jury, all of which
are assigned for error as, when taken as a whole, they show a
prejudice or bias on the part of the court against the accused,
this court will examine the whole charge for the purpose of
ascertaining if such prejudice or bias be shown. In the present
case the instructions are not thought to be objectionable on that
ground.

4. ———: ———: MALICE. On the trial of an accused charged with
the crime of murder in the first degree, the court gave the jury
the following instruction: "Malice, within the meaning of the
law, includes not only anger, hatred, ill will, and a desire for
revenge, but every other unlawful and unjustifiable motive. A
thing done with a wicked mind, and attended with such circum-
stances as plainly indicate a heart regardless of social duty and
fully bent on mischief, indicates malice within the meaning of
the law. And the existence of malice is inferred from acts com-
mitted or words spoken." *Held*, Not erroneous.

5. ———: ———: GREAT BODILY HARM. An instruction defining
"great bodily harm" as being "a battery of greater magnitude
than a common assault and battery," *held* not erroneous by rea-

son of the use of the term "common assault and battery," without further definition of "assault and battery"; the meaning of the term "assault and battery" being known in common speech by people of ordinary intelligence, it is presumed the jury understood it.

6. ———: ———: SELF-DEFENSE. In an instruction on the law of self-defense, otherwise unobjectionable, it is *held* not erroneous for the court in stating the law to say: "Where a man in the lawful pursuit of his business is attacked, and where from the nature of the attack he honestly believes that there is a design to take his life or to do him great bodily injury," etc.—the objection being that it left the jury to infer that the accused was not in the lawful pursuit of his business when he entered the place of business of the deceased for the purpose of procuring property which he claimed belonged to him, notwithstanding the court had refused an instruction that he had the right to go there for that purpose.

7. ———: WITNESSES: EXAMINATION: WAIVER OF ERROR. The evidence showed that the deceased and the accused met at an attorney's office for the purpose of adjusting a money demand which the accused made upon the deceased; that in the conversation there was much ill feeling shown; the accused having been assaulted and beat by the deceased a number of times during that day. The deceased renewed an accusation that the accused had stolen money from the place of business where he had been employed, refused to pay anything, ordered the accused to cease his demands, and left the room. ' Immediately thereafter the accused made the remark, "I'll fix him," and departed. On cross-examination the witness was asked if deceased had not in that conversation made threats to the accused of personal violence whenever he should meet him. Objection to the questions was made by the attorney for the state upon the ground, among others, that the proof of the facts sought to be elicited was a part of the defense. The objections were sustained. *Held*, Error. But, as the attorney announced that he would make the witness his own for the purpose of making the proof, and did, at a subsequent stage of the trial, call the witness on the part of the defendant and inquired into the details of the conversation, but refrained from in any form repeating the questions ruled out on cross-examination, it is *held* that the error was waived.

8. **Homicide:** INSTRUCTIONS: INTOXICATION. It was shown by the evidence that the deceased was killed by the accused between the hours of 4 and 5 o'clock in the afternoon; that the accused drank intoxicating liquors freely during the day and up to a short time before he killed the deceased; but there was no proof

that at the time of the tragedy the accused was so far intoxicated as to render him irresponsible for his acts. The court instructed the jury that voluntary intoxication would not relieve a person committing a crime from the penalties of the law; but that, if there was evidence that the accused was intoxicated at the time it was alleged that he committed the crime, it should be considered by the jury for the purpose of determining whether he was capable of forming a wilful, deliberate and premeditated purpose to take life. If he was so far intoxicated as to be incapable of forming such purpose, and the jury entertained a reasonable doubt upon that subject, he could only be found guilty of murder in the second degree, if guilty of murder. This was in accordance with an instruction asked for by the defense. But the court added that, if the jury found that the accused took intoxicants "to steady his nerves for the commission of the crime," his intoxication would not excuse him. *Held*, That, though there was no occasion for the instruction, the error in giving the addition was not prejudicial, and therefore harmless.

9. **Criminal Law: TRIAL: OPENING STATEMENT.** Section 478 of the criminal code provides that after the jury is impaneled, and after the attorney for the prosecution has made a statement of the case and the evidence by which he expects to sustain the charge, "the defendant or his counsel must then state his defense, and may briefly state his evidence he expects to offer in support of it." Under the provisions of this section, neither party may discuss the law of the case, nor instruct or admonish the jurors as to their duties as such jurors; it being the province of the court alone to instruct the jury. It is not error for the court to confine counsel to the statement of the case and the evidence they expect to produce.

10. **Homicide: DEFENSES.** It was disclosed by the evidence adduced upon the trial that during the earlier part of the day on which deceased was killed he committed a number of assaults upon the accused, beating and cuffing him, but that no assault had been made immediately prior to the time when deceased was killed, and on that occasion deceased ejected the accused from his place of business by pushing him out through the door and inflicting a slight assault. Although these facts might be considered in mitigation, they, as matter of law, afforded no defense to the charge of murder, the essential elements of that crime having been found by the jury to exist at the time deceased was killed.

ERROR to the district court for Box Butte county: JAMES J. HARRINGTON, JUDGE. *Affirmed.*

*Hamer & Hamer,* for plaintiff in error.

*W. T. Thompson, Attorney General,* and *Grant G. Martin, contra.*

REESE, J.

An information was filed in the district court for Box Butte county, charging plaintiff in error (hereinafter referred to as plaintiff) with the crime of murder in the first degree committed on the 29th day of January, 1907, by shooting Leroy W. Barnes. There is not much conflict in the testimony of the witnesses as to the material facts surrounding the tragedy. The deceased, Barnes, was in charge of a lunch counter near the railroad depot at the city of Alliance. Plaintiff was employed by the proprietor as night man in charge. His hours were from 7 o'clock in the evening until 7 o'clock the next morning. He had worked six nights. On the morning of the 29th of January, 1907, the deceased came to the lunch room, and appeared to be checking up the cash register. Plaintiff remained in the lunch room until about half past 7 o'clock, when he left and went to a nearby saloon. He remained there for some time, when the deceased came in, seized hold of him, administering an opprobrious epithet, accusing him of being a thief, and demanding the return of the money which he claimed plaintiff had stolen. Plaintiff had about $10, which deceased sought to take from him, but in which he was not successful. Plaintiff denied the appropriation of any money, and vigorously persisted in his denial. He was of the age of 22 years, and the weight of about 122 pounds. The deceased was much his superior in age, size and strength. Instead of causing the arrest and prosecution of plaintiff for the alleged embezzlement, he seems to have determined to extort the money by threats, abuse, assaults and personal violence. On a number of occasions during the day he is shown to have followed plaintiff from place to place, and

assaulted and beat him rather unmercifully. Plaintiff was drinking heavily, which, in addition to his diminutive size and strength, rendered him unable to resist the attacks of the deceased. He, on some occasions, would escape, but to be followed and punished by beatings and cuffings. He was discharged by the deceased early in the day, but did not receive payment for the six nights' labor. Deceased refused to pay him, claiming that he had paid for clothing—aprons and jackets—worn in the lunch room, and other expenditures made on behalf of plaintiff. Plaintiff consulted two local attorneys upon the matter of making the collection of his wages, and one had telephoned deceased to call at his office for the purpose of seeing if the matter could not be amicably adjusted. The deceased had answered the call, and the parties met in the attorney's office, but no adjustment could be made, as the deceased presented his claim for the fees of the employment agency at Denver through which plaintiff was employed, and the cost of the aprons and jackets for which the deceased had paid, but which, upon being paid for, belonged to the employees for whom they were purchased. The deceased claimed that those two items and money advanced amounted to more than the wages due, and refused to pay anything, informed plaintiff that he "did not owe him anything, and would not pay him anything, and then said: 'Now, Roy, I don't care to have any more trouble with you about this' "—and went away. Plaintiff stood by a window for a time, and then, applying to the deceased an epithet which deceased seems to have frequently applied to him, said: "I'll fix him," and left the office. He sought another local attorney for assistance in recovering what he claimed to be due him, but met with no better encouragement than in the first instance, probably on account of the smallness of his claim, which was $4.80, and which was not sufficient to fully balance the demands of the deceased. Plaintiff seems to have been drinking excessively during the whole of the day.

23

After his failure to secure assistance in his effort to collect he went to a hardware store and purchased a pistol and cartridges. This purchase was made in the afternoon, probably about 2 o'clock; and in his testimony plaintiff states that the purchase was made in order to enable him to defend himself against further attacks of the deceased. About half past 4 in the afternoon he went to the lunch room, opened the door, stepped inside, closing the door behind him. He remained standing quietly for a short time, when the deceased, seeing him, walked rapidly toward him, and said: "You get out of here, and stay out. I don't want you around at all." Plaintiff replied: "I have got an apron and jacket here, and want them." Deceased responded: "You haven't anything of the kind; get out"—took hold of him, opened the door and pushed him out, closing the door, as some of the witnesses say, when plaintiff immediately turned and fired, killing the deceased. There were four persons present and witnessed the encounter. They were all sworn on behalf of the prosecution. While they agreed as to many of the principle facts, yet in details there was some conflict. Some say that, when the deceased put plaintiff out of the house, he closed the door, which plaintiff immediately opened, and fired three shots; while others say the door was not closed, but as plaintiff was being forced into the opening he fired the shots in rapid succession. Plaintiff became a witness in his own behalf, and his version of the affair agrees with that of some of the state's witnesses, except as to the language used by the deceased, and the further fact that deceased both kicked and struck him as he crowded him to the open door, and that when so kicked and struck he, in self-defense, drew the pistol and fired. Plaintiff then left the lunch room, went to a nearby saloon, procured more liquor and drank it, saying he had killed the deceased, and soon thereafter surrendered himself to the officer of the law. The verdict of the jury found plaintiff guilty of murder in the first degree, and fixed the sentence at imprisonment for life. Plaintiff prose-

cutes error to this court, alleging errors committed during the trial, including instructions given to the jury and instructions prayed for by him and refused, as well as the contention that the verdict for murder in the first degree is not sustained by the evidence.

At the commencement of the trial plaintiff, by his counsel, requested the exclusion from the court room of the witnesses for the state not upon the stand, which request was refused, and to which exception was taken. There is no reason shown by the record why this request was refused. We are unable to find anything throwing light upon the action of the court, either of reasons for refusing the request or, why it should have been granted. Aside from what was developed later in the trial, and of which the court presumably had no knowledge at the time of the ruling upon the request, we are not advised of any abuse of discretion on the part of the court. That such a request, in cases of the importance of this one, should be granted cannot be questioned. As said in the syllabus in *Chicago, B. & Q. R. Co. v. Kellogg,* 54 Neb. 138: "The practice of causing unexamined witnesses, except those called as experts, to be sequestered, so that they may not hear the testimony of the witness being examined, is a good one, as it tends to elicit the truth and promote the ends of justice." However, the ruling of the trial court refusing such a request does not call for a reversal of the judgment where an abuse of discretion is not apparent.

On the trial plaintiff became a witness in his own behalf, and during his cross-examination by the attorney for the state he was asked the following questions, to which he made answers as here shown: "Q. He (referring to deceased) pushed you out of the door, did he? A. Part way out, yes, sir. Q. Was your face toward the street? A. It was. Q. And did you turn around then and come back into the restaurant? A. I did, just as soon as he hit me. Q. What did he do after he pushed you out? A. He just stepped back a couple of steps when

he seen me jerk my gun. Q. How far did he step back?
A. A couple of feet. Q. You saw him step back? A. Yes,
sir. Q. And did you shoot at him as he stepped back? A.
He was stepping backward, his face was toward me. Q.
He was standing with his face toward you? A. Yes,
sir; at the time I shot. Q. And you shot him through the
neck, this way? A. I couldn't say where the bullet went
in. Q. Was he stepping back at the time you shot him?
A. Yes, sir. Q. What was the distance between you at
the time you shot him? A. I should judge four or five feet.
·Q. Then both times you shot him his face was directly
toward you, was it? A. I think so, I couldn't say positive.
Q. Now, what time did you work, in the day time or at
night? A. I worked at night." The court here took
plaintiff in hand and questioned him. "Q. Did you step
in the door as he was backing off? A. One foot was in
the door. He didn't get me all the way out. Just as he
hit me on the ear my head flew to one side, like this, I
can represent it to you. (Witness stands up.) I was
facing like this, and he walked up face to me, and grabbed
hold of me, whirled me around, like that, and gave me a
kick on the hip, and then he hit me right back of the ear.
Just as I whirled out of the door I jerked my gun and
shot. Q. Which way was he going? A. He was stepping
back, like this, just as he shoved me out he stepped back.
Q. About how far had he got back when you shot? A.
About three or four feet, I should judge. ,Q. And still
going backward? A. Yes, sir."

This action of the court was excepted to, and is sharply
criticised as an abuse of discretion and "a distinct effort
on the part of the judge to lead the witness to say that at
the time he fired upon deceased the deceased was re-
treating from him. This was done with a view of demon-
strating to the jury that the defendant was then in no
immediate danger of the deceased," and that this action
"on the part of the trial judge must have very much
prejudiced defendant's case." The question here pre-
sented was before this court in another form in *Fager v.*

*State,* 22 Neb. 332, and the subject was discussed at some
length.  In that case questions were propounded by the
court to a witness for the state, the prosecuting witness,
in a prosecution for an assault upon her.  In this case the
questions are propounded to the accused.  In that case the
rule agreed to by all the members of the court seems to be
that, unless in case of urgent necessity, the presiding
judge should refrain from interfering in any way with
the progress of the trial; while Judge MAXWELL held to
the further view that the law required the court to abstain
from propounding any questions to witnesses or in any
way interfering with the management of the trial of
criminal cases.  However, unless it is made to appear
that the action of the court has in some way been to the
prejudice of the party on trial, the judgment should not,
on that ground and for that reason alone, be reversed.
While this is true, we all agree that the practice is wrong
and, as a general thing, should not be indulged in.  It will
be observed that the course pursued by the judge in the
matter of the examination of plaintiff was practically a
repetition of that pursued by the prosecuting attorney.
On material points, the questions by the court and answers
of plaintiff made little, if any, change in the result of the
testimony.  It is not a question of the motives or purposes
of the trial judge in asking the questions, but what was
the effect of the court's action.  If not prejudicial, no harm
resulted to plaintiff.  While we cannot approve the action
of the court, we cannot see that the rights of plaintiff were
jeopardized thereby, and, therefore, cannot reverse the
judgment on that ground.

While all the instructions to the jury are assigned for
error, but few of them are criticised in the brief and argu-
ment of counsel for plaintiff.  It is claimed that, taking
the instructions as a whole, they show upon their face
that the court sought to and did impress upon the minds
of the jurors a general trend against plaintiff, and
thereby gave the jury to understand that the presiding
judge believed he was guilty of murder in the first degree,

and that that fact caused the jury to return the verdict finding him guilty of the higher crime. With this contention in view, we have carefully considered all the instructions, but are unable to see that this criticism is supported. They are too long to be here set out, and we must be content with this general statement.

Counsel for plaintiff requested the giving of three instructions. These requests were all refused, and to the refusals exceptions were severally taken. It is not necessary to notice this feature of the case further than to say that the substance of all was included in those given by the court on its own motion, which was sufficient.

The definition of malice given in the twelfth instruction is objected to. The part of the instruction referred to is as follows: "And 'malice,' within the meaning of the law, includes not only anger, hatred, ill will, and a desire for revenge, but every other unlawful and unjustifiable motive. A thing done with a wicked mind, and attended with such circumstances as plainly indicate a heart regardless of social duty and fully bent on mischief, indicates malice within the meaning of the law. And the existence of malice is inferred from acts committed or words spoken." This definition has been substantially approved in this state in the cases of *Housh v. State,* 43 Neb. 163, and *Carr v. State,* 23 Neb. 749. The court seems to have substituted the word "fully" for "fatally," but this cannot be said to have been prejudicial. See Good and Corcoran, Nebraska Instructions to Juries, p. 309, *et seq.*

Specific objections to some of the instructions are made which we should notice. By the thirteenth instruction given, and which will not be copied in full on account of its length, the jury were informed that, when a person in the lawful pursuit of his business is violently assaulted by one whom he honestly believes intends to take his life or inflict great bodily harm, the person so assaulted may kill to save his own life or protect himself from such assault. The instruction continues: "The term 'great bodily harm' cannot be accurately defined, but it means a battery

of greater magnitude than a common assault and battery. And if you find from the evidence in this case that the deceased assaulted the defendant at the time he ejected him from the eating house referred to in the evidence, and that the deceased in making the assault, if you find that he did make an assault, intended to simply inflict upon the defendant what is known as a common assault and battery, and the defendant believed and understood it as such, then he would have no right to intentionally take the life of the deceased. A person is only justified in taking the life of his assailant when he honestly believes that he is about to lose his own life, or that his assailant is about to inflict upon him great bodily harm. But if the person making the assault intended it only as a common assault and battery, and the person assaulted believed that the person making the assault was going to inflict upon him great bodily injury, or was about to take his life, then if under such circumstances the person who is being assaulted takes the life of his assailant, prompted by the sole motive of self-preservation, the law will excuse him. But he must not use any greater force to repel force than what seems to him to be reasonably necessary under the circumstances. And, if after he has secured himself from danger he takes the life of his assailant in the spirit of revenge, he cannot claim exemption from punishment on the ground of self-defense." The criticism upon this part of the instruction is as to the use of the words "a common assault and battery." It is said that "in common language there is no such thing as 'a common assault and battery.' Neither is there such a thing in legal terms. No one may know by that language what it means." This criticism may, in a strict sense, be well founded, and yet there be no prejudicial error in the instruction. No doubt it would have been better had there been some definition of what is known in law as an assault and battery, and the word "common" discarded, but it is thought that it does not require a higher degree of information and intelligence than the jury may be presumed to have possessed to

comprehend the meaning of the words as they were used in the instruction and are similarly used in common speech. The jury evidently understood what was meant. Again, had counsel for plaintiff desired a more elaborate instruction on that point, he should have submitted a proper request. Failing to do so, the objection must be considered as waived. But it is contended that, as testified by plaintiff, the deceased kicked and struck him as he pushed him out of the door. Judging by the testimony of other witnesses as to the occurrences during the day, the statement is probably true, and yet the deceased had ceased assaulting plaintiff and was moving away when the fatal shots were fired, thus demonstrating that no serious injury was to be apprehended at that time. These facts were doubtless in the mind of the court when the language of the instruction, now criticised, was used, to wit: "And, if after he has secured himself from danger he takes the life of his assailant in the spirit of revenge, he cannot claim exemption from punishment on the ground of self-defense." Considering all the evidence upon this feature of the case, we think the quoted language was properly used in the instruction.

The nineteenth instruction was excepted to, and is now assigned for error. It is as follows: "The jury are instructed that the defense of necessary self-defense is interposed in this case. This defense is legal and proper in a criminal case. This defense is interposed by law, and you are required to consider it in view of the testimony in this case. And it will be your duty to consider it fairly and honestly upon its merits. And the rule of law on the subject of necessary self-defense is this: Where a man in the lawful pursuit of his business is attacked, and where from the nature of the attack he honestly believes that there is a design to take his life or to do him great bodily injury, then the killing of his assailant under such circumstances would be excusable or justifiable, although it should afterwards appear that no great bodily injury was intended, and no real danger of losing his life or receiving

great bodily injury existed. And the jury are instructed that, if you find from the evidence that at the time the defendant is alleged to have killed the deceased the circumstances surrounding the defendant were such as in sound reason would justify or induce in the defendant's mind an honest belief that he was in danger of receiving from the deceased great bodily harm, or that the defendant was about to lose his life, and that the defendant in doing what he then did was acting from instinct of self-preservation, then he is not guilty." Two objections are urged to this instruction. The first is to the language, "where a man in the lawful pursuit of his business is attacked," etc., and the second is to the use of the words "sound reason," near the close. We are unable to see any prejudice to plaintiff in the language used. Plaintiff's attorney requested the court to instruct the jury that "defendant had a right to enter the building where the shooting occurred," etc., and the instruction was refused; and it is now claimed that the instruction given left the question of his right to enter the eating house in doubt, and that the jury should have been informed that he had the lawful right to enter the building. There is no doubt but that he had that right. But it is equally clear that the deceased terminated his right to be there by telling him to depart. This order was not immediately obeyed, and deceased had the right to use such force as was necessary to eject plaintiff, but not to kick or strike him, if he did so. However, we do not think the instruction is open to the criticism that plaintiff had not rightfully entered the house. His entry was not unlawful. It is true he had been forbidden the premises, but, notwithstanding that fact, he still had the right to enter for the purpose of procuring or demanding the possession of what he claimed as his property. But, when ordered to depart, he, failing to do so, became a trespasser, and deceased had the right to eject him. We think the instruction is not open to the construction contended for. To the use of the words "sound reason" we can see no objection. The

phrase is equivalent to "good reason," which would not
be objectionable. *Coil v. State,* 62 Neb. 15.

During the afternoon of the day of the tragedy plaintiff
consulted the county attorney upon the subject of the
collection of the wages claimed to be due him for his labor.
The attorney telephoned the deceased, who came to his
office, met the plaintiff, and the subject was gone over
between the deceased and the plaintiff. It appears that
in the conversation deceased accused plaintiff of stealing
money from him while in his employ, and positively
refused payment of the demand made by plaintiff. This
charge of theft or embezzlement was strenuously denied at
all times, and plaintiff asked deceased why he did not
cause his arrest. The evidence is not entirely satisfactory
as to what further was said at that time, but it is pretty
clear that deceased was quite abusive and insulting. He
went away, leaving plaintiff in the attorney's office.
Plaintiff stepped to a near-by window, and stood there for
a while, when he applied the opprobrious epithet in
common use with some, and said, "I'll fix him," and soon
after left the office. On cross-examination the witness
testified that there was no violence there between the
parties; that as soon as deceased had declared he would
not pay the demand, and had told plaintiff he did not care
to have any more trouble about the matter, he walked out.
Witness was asked if deceased called plaintiff any names,
and the answer was: "I don't think they either called the
other any names in the presence of the other." The threat
was made after deceased had left the office, probably soon
thereafter, but just how long is not clearly stated.
Counsel for the defense asked the witness on cross-
examination if he was present during the whole of the
interview, and the answer was that he had been present
all the time. The following is shown by the record: "Q.
Did you hear Mr. Barnes say anything about beating
him, either that he had or that he would? Counsel for
state objects as improper cross-examination, incompetent,
irrelevant and immaterial, and part of their defense, if

anything.  Sustained.  Exception.  By Judge Hamer
(defendant's attorney) : I will make you our witness.  By
Mr. Mitchell (counsel for state) : Well, wait until we get
through with our case.  By Judge Hamer:  Q. During
this conversation did Barnes say he would beat hell out
of him every time he met him, or anything equivalent to
that?  Counsel for state objects as incompetent, irrelevant
and immaterial, and improper cross-examination, and
part of their defense, if anything.  Sustained.  Exception.
Q. Now, Mr. Burton, you say at the time he was up there,
that is, one of these times, that he threatened to kill him,
or something like that?  A. No, sir.  He said: 'I will fix
him.'  Q. He said, 'I will fix him'?  A. Yes, sir.  Q. Now,
was that in connection with the fact that Barnes said he
would beat hell out of him every time he met him?
Counsel for state objects as incompetent, irrelevant and
immaterial, and not proper cross-examination, and no
such testimony being in evidence.  Sustained.  Exception.
Q. Did you hear Roy Maynard make these threats im-
mediately after Mr. Barnes had said what he would do,
whatever it may have been?  Counsel for state objects as
incompetent, irrelevant and immaterial, improper cross-
examination, and presuming something to be in evidence
which is not in evidence, and part of their defense.  Ob-
jection sustained.  Exception.  Q. Were these threats,
which you say Maynard made, in the presence of Mr.
Barnes, or immediately after Barnes had left?  A. Im-
mediately after Mr. Barnes had gone out.  Q. Now, did
Mr. Barnes immediately before he went out, in your
presence and hearing, tell, and in the presence of this
defendant state, what he would do?  You need not say
what it was, but whether he told you.  Counsel for state
objects as incompetent, irrelevant, and immaterial, im-
proper cross-examination, and presuming something to be
in evidence which is not.  Sustained.  Exception."

Just what were the mental processes of the attorney in
making these objections, or of the court in sustaining
them, we cannot inquire.  The threat, if it should be so

termed, was made immediately after the departure of the deceased. The length of time must have been very short indeed, as the witness at another stage of the trial testified that the deceased had just stepped out of the office, and the witness then thought that he was still in the hall adjoining the office at the time the alleged threat was made. This brought the remark so near a part of the conversation as to, in effect, make it a part of it, and we are wholly unable to conceive any just or legal reason for the making or sustaining the objections. Whether or not the ruling of the court was prejudicial to the defendant on trial in its final results is not now under consideration. That the objection should have been overruled must be clear to any legal mind, as the answer might have given color to the meaning of the remark made by plaintiff. As is above shown, counsel for plaintiff appears to have submitted to the ruling and decided to call the witness on the part of the defense, or, as he stated: "I will make you our witness." After the state had rested this witness was called on the part of the defense, and he was interrogated upon the subject of the interview in his office, much of his former testimony, including the alleged threat by plaintiff, being repeated, but no questions were asked him as to any threats having been made by the deceased, nor was any reference made to the subject contained in the questions to which the objections had been sustained. The conclusion must be that counsel for the defense had discovered that there was no reason for further investigation into that subject, and the error, if any, was waived.

The tragedy occurred late in the afternoon, and the evidence shows that plaintiff drank intoxicating liquors frequently during the day. The defense requested the court to give the following instruction: "Evidence has been introduced tending to show that the defendant on the day of the killing had been drinking intoxicating liquors to excess, and that he was intoxicated. The intoxication of the accused can only be considered for the purpose of determining whether he is guilty of murder in the first

degree.  If he was so far intoxicated as to be unable to deliberate upon the consequences of his act and to premeditate an intent to kill, he is not guilty of murder in the first degree."  This was refused, and the court gave the following on its own motion: "The jury are instructed that voluntary intoxication is no excuse for the commission of crime, and will not relieve a person committing a crime from the penalties of the law.  Still, in a case of this kind, if there is evidence introduced that the defendant was intoxicated at the time it is alleged he committed the crime, it should be considered by the jury for the purpose of determining whether the accused at the time of the alleged killing was capable of forming a wilful, deliberate and premeditated purpose to take life.  And if in this case, although you believe from the evidence beyond a reasonable doubt that the defendant killed the deceased in manner and form as charged in the information, still, if you further believe from the evidence that at the time he inflicted the fatal injuries he was so deeply intoxicated as to be incapable of forming in his mind a design deliberately and premeditatedly to do the killing, or if you entertain a reasonable doubt as to these things, then such killing would only be murder in the second degree. If, however, the defendant took intoxicants to steady his nerves for the commission of the crime with which he stands charged, then his intoxication would neither excuse the crime nor reduce it from murder in the first degree to the second degree."  As this instruction covers all that is contained in the instruction refused we need not notice that instruction further.  However, the closing sentence of the instruction given is severely criticised by counsel for plaintiff as submitting a question upon which there was no evidence, and it is insisted that it was prejudicial for that reason.  While it is true that it was shown that plaintiff drank heavily during the day, yet we can see no urgent necessity for giving any instruction upon the subject named.  There can be no doubt but at the particular time of the tragedy plaintiff was in the

Maynard v. State.

possession of his faculties, and well understood just what he did and why he did it. Whether he anticipated an attack by the deceased or not he evidently was not in such condition from existing intoxication as to dethrone his reason or excuse the commission by him of an unlawful act. However, the instruction was asked and given, in substance, and no complaint can be or is urged on that ground. Since the question was submitted, it was not prejudicially erroneous for the court to add that, if plaintiff drank intoxicants for the purpose named, his intoxication would not excuse him nor reduce the degree of the crime. We grant that there was no necessity for the precaution, but cannot see that it could prejudice plaintiff.

After the return of the verdict a motion for a new trial was filed, in support of which certain affidavits were submitted. The point of contention presented by the affidavits has reference to the opening statement made, or attempted to be made, by the attorney for the defense after the jury was impaneled and before the introduction of evidence. The affidavit made on this behalf is very lengthy, and cannot be here even summarized. Section 478 of the criminal code provides that, after the jury has been impaneled and sworn, "the counsel for the state must state the case of the prosecution, and may briefly state the evidence by which he expects to sustain it. The defendant or his counsel must then state his defense, and may briefly state his evidence he expects to offer in support of it." The affidavits show that when the attorney came to state the case of the defense he gave considerable attention to what may be termed an instruction or admonition to the jury as to their duties, and to the law which would govern the case as the trial progressed. Objection was made to this, and the objection was sustained. Counsel then engaged in a contest with the court as to his rights, and demanded that the reporter might take down what he might say, and that he be permitted to go on. This the court refused, and informed counsel that

if he did not desire to state his defense he would have to desist, when the attorney proceeded with a proper statement of the defense which would be offered. In this ruling the court was clearly correct. The statute is free from ambiguity, and the rights of counsel are defined with all necessary precision. The defense may be stated, together with a brief statement of the evidence by which it will be supported. All the instructions and admonitions upon questions of law are for the court.

It is contended that the verdict of murder in the first degree is not supported by the evidence. The natural impulse, entertained by all right-minded people, is to give every one what has of late been termed a "square deal." This sentiment, no doubt, prompts counsel for plaintiff to insist that this measure of justice has not been meted out to his client. It cannot be denied but that plaintiff was to quite an extent inhumanly treated during the forenoon of the day upon which the tragedy occurred. He was followed from point to point and place to place, and repeatedly assaulted by deceased who was a much larger, stronger and more mature man. Many citizens and sojourners in the city of Alliance observed the beatings and cuffings administered by the deceased, but no one interfered. The officers of the law were, no doubt, aware of the many assaults committed upon plaintiff, but no arrest of deceased followed. Had this duty been performed, we can well imagine that the tragedy would have been averted and the deceased's life would have been spared. If the plaintiff had embezzled the money of deceased the courts were open for the prosecution of the offender, but there was no authority for assaulting him, knocking him down, and cuffing him upon the streets and in public places. The failure of the officers of the law to discharge a plain duty, no doubt, unintentionally contributed to the terrible conditions which followed. Plaintiff was a young man, a stranger, and without friends. After his interview with deceased at the county attorney's office, which was about 2 o'clock in the afternoon, he went to a hardware store and

purchased a revolver and a number of cartridges, which, he says, were purchased for his defense. The purchase of the weapon was of itself no crime. What his real intentions may have been can only be surmised. According to the testimony of Mr. Burton, the county attorney, plaintiff was indebted to deceased in the sum of $2.45, over and above the amount of his wages. The statement of the account was that, including the amount paid by deceased for the jacket and apron, and money advanced, plaintiff was indebted to deceased $7.25, and deceased was indebted to plaintiff the amount of his wages, $4.80. Plaintiff thought he was entitled to the jacket and apron, or so claimed. So believing, he had the right to go to the eating house and make demand for them. Upon his demand being refused and the order given him to depart, he had no right to remain longer, and deceased had the right to eject him, using such force only as was necessary. According to the apparent preponderance of the evidence, and which the jury doubtless believed, no unnecessary assault was made upon him at that time. He was pushed out at the door, and, as he went out, he shot deceased, who was then moving from him. Judging by the location of the wounds inflicted, he shot to kill. Leaving out of consideration what had occurred during the day, the jury were justified in deciding that the killing was murder. By strict legal rules the occurrences of the day cannot be considered, however galling they may have been. The state does not permit the law of retaliation. Whatever might have been our own views of the case as to the degree of the offense, had we been one of the triers of fact, the question was for the jury, and with their verdict we must be content.

It follows that the judgment of the district court must be, and is,

AFFIRMED.