## GEORGE WILSON v. STATE OF NEBRASKA.

FILED OCTOBER 22, 1910.     No. 16,621.

1. **Criminal Law:** INDORSEMENT OF WITNESSES ON INFORMATION. The names of witnesses upon which the state relies to prove the charge against one accused of crime should be indorsed upon the information at as early a day as practicable after the discovery of such witnesses, and in all cases before the cause is called for trial, and reasonable time after such indorsement should be allowed to enable the defendant to prepare for trial.

2. ———: JURORS: DISQUALIFICATION. A juror in a criminal prosecution, where the defendant is accused of murder in the first degree, disclosing on his *voir dire* examination that he has an opinion as to the guilt or innocence of the party charged, and being shown that such opinion is formed, in part, upon his actual knowledge of many of the facts to be proved on the trial, his personal inspection of the place where the tragedy occurred soon after the commission of the alleged offense, his visit to the home of the deceased the evening of and after the alleged killing, his personal acquaintance with the deceased, his lodging during the night of the tragedy at the same hotel where the accused boarded, his knowledge of the arrest of the accused the next morning and hearing remarks by the people present that they thought the accused was guilty, should render him incompetent to sit as a juror in the trial of the case.

3. ———: ———: EXAMINATION. It is the policy of the law that a person charged with a capital offense, and placed upon trial therefor, should have ample opportunity, in the examination of jurors as to their qualifications to act as such upon the trial, to ascertain the facts as to their competency, and his right in that behalf should not be unreasonably abridged or denied.

4. ———: EVIDENCE. In a prosecution of a defendant charged with murder in the first degree, it is error to allow proof by the state, in making its case in chief, that the accused had committed the crime of desertion from the United States army a short time previous to the alleged homicide.

5. ———: TRIAL: MISCONDUCT OF PROSECUTOR. The evidence showed that the accused was a married man; that his family resided in the state of South Dakota; that after coming to this state he had agreed to marry another woman with whom he was on intimate terms, the woman with whom the agreement was made being sworn as a witness to prove the fact of the promise, but the marriage relation had not been entered into. The prosecution

caused and procured the wife of the accused to come from South Dakota, take her place within the bar during the trial, and procured a witness to designate and point her out to the jury. *Held*, improper practice.

6. ———: WITNESSES: EXAMINATION BY THE COURT. While it is the right of a trial judge in the exercise of a sound discretion, and in case of urgent necessity, to interrogate witnesses on the trial of a criminal case, or even the accused himself when upon the witness stand, when essential to the administration of justice, yet the practice of so doing should be discouraged, and, in some instances, condemned. Should this discretion be abused, or prejudice to the accused be apparent, a new trial should be granted.

7. Constitutional Law: TRIAL BY JURY: DUTY OF COURTS. The constitution and laws guarantee to every person a fair and impartial trial by an impartial jury. The obligation to protect these constitutional rights devolves upon the courts, and no court, when called upon to act, can shirk or evade the responsibility cast upon it by law.

8. Criminal Law: TRIAL: MISCONDUCT OF PROSECUTOR. In the argument of a cause to the trial jury in a case where the accused was on trial charged with murder in the first degree, an attorney for the prosecution said to the jury: "If this jury find the defendant guilty and do not bring in a verdict recommending the death penalty, no member of this jury need come to me and apologize, or to apologize to any member of the audience." This is *held* to be such a gross violation of the rules of argument as to require the strongest censure; and no condemnation of the language by the trial court can effectually obliterate the injury and prejudice which might result to the accused.

ERROR to the district court for Brown county: JAMES J. HARRINGTON, JUDGE. *Reversed.*

*J. A. Douglas,* for plaintiff in error.

*William T. Thompson, Attorney General,* and *George W. Ayres,* contra.

REESE, C. J.

Plaintiff in error was convicted of the crime of murder in the first degree, and, his punishment having been fixed

by the jury at death, he was sentenced by the court to be hanged. He presents his case to this court by proceedings in error for review.

The information under which he was put upon trial charged him with the crime of murder in the perpetration of a robbery. The person alleged to have been killed was Jacob Davis, Junior, and the crime was alleged to have been committed at Ainsworth, in Brown county. There seems to be no doubt but that Davis was brutally murdered near his own door on the night of December 27, 1909, in the city of Ainsworth, and that he was robbed at the same time, the indications supporting this latter theory being the fact that, when he was discovered a short time before his death, no money was found on his person, and one of his pockets, the one in which he usually carried his money, was turned or drawn out as though it had been hastily rifled of its contents. He was never restored to consciousness and no evidence could be obtained from him as to the facts of the assault upon him, nor who was the guilty party. He died within three or four hours after receiving his injuries. An examination of his body before and after death showed that he had been struck on the head with some instrument by which his forehead and scalp were severely injured and the skull fractured, and also showed a gunshot wound passing through the head from the right to the left side, the ball entering on the right side a little above and back of the ear and lodging against the scalp upon the opposite side. The crime was committed between 11 and 12 o'clock at night as deceased was returning home from his place of business, the night being a bright moonlight night, the ground covered with snow. The fact of the commission of the crime by some one is not questioned. There was no direct evidence of the guilt of plaintiff in error, and the question of his connection with the commission of the offense depends upon circumstantial evidence alone. It is not our purpose to discuss the evidence with regard to its convincing quality, as, according to our view, a new trial must be had, and

the evidence upon a second trial may differ in some particulars from that presented on the first.

The first contention of plaintiff in error is that the district court erred in permitting the indorsement of the names of ten additional witnesses upon the information. The record shows that the information was filed on the 31st day of January, 1910. On the 1st day of February, following, plaintiff in error was arraigned, and entered his plea of "not guilty" to the information. The cause was set for trial on the 14th day of the same month, when court adjourned to that day at the hour of 10 o'clock A. M. On that day, "after 9:30 o'clock A. M.," notice was served upon counsel, who had been appointed to defend plaintiff in error, of the pendency of the motion for leave to indorse the ten additional names upon the information. When court convened and the trial was about to proceed, and "one juror had been called by the clerk and had taken his seat in the jury box," the county attorney presented his application for leave to indorse the names, and the "juror thus called was informed by the court he would not be needed, and requested to vacate the jury box, which he did," and permission was given to make the indorsement. The showing made by the county attorney was to the effect that the ten persons, naming them, were material witnesses for the state; that at the time of the filing of the information it was not known to the county attorney or to the other attorneys for the prosecution (there being two others assisting the county attorney) that the persons named would be material witnesses; and that "the same was not known by affiant (the county attorney) until after the adjournment of court on February 1, 1910." Formal objection was made to the granting of the order. The court granted the leave asked, and "advised the defendant and his counsel that the court would on its own motion continue said cause for 24 hours," when counsel "consented to waive said time and proceed with the trial, * * * renewing, however, his objections to the indorsement of additional names on the information."

44

By section 579 of the criminal code it is provided that the prosecuting attorney shall indorse upon the information "the names of the witnesses known to him at the time of filing the same; and at such time before the trial of any case as the court may, by rule or otherwise, prescribe, he shall indorse thereon the names of such other witnesses as shall then be known to him." In *Stevens v. State*, 19 Neb. 647, we held that this provision was intended to apprise the accused in advance of the trial what witnesses would testify against him, and must be strictly complied with by the prosecutor, and in *Sweenie v. State*, 59 Neb. 269, it was held to be error for the court to permit the name of a witness for the state to be indorsed on the information after the commencement of the trial. In *Gandy v. State*, 27 Neb. 707, 732, it was held that the names of witnesses cannot be added unless it be shown that they were not known before. In *Gandy v. State*, 24 Neb. 716, it was held that the prosecutor should indorse the names of witnesses on the information before the day of trial, if known to him. In *Parks v. State*, 20 Neb. 515, we held, quoting from the supreme court of Michigan (from which state our statute was substantially taken), that "the defendant has a right to know in advance of the trial what witnesses are to be produced against him, so far as then known, and to have any new witnesses indorsed on the information as soon as discovered." It is not deemed necessary to refer further to our decisions upon this point. As we have already observed, the showing made by the county attorney was that the names of the witnesses were not known to the attorneys for the prosecution at the time of the filing of the information, nor until after the adjournment of the court on February 1; but there is no showing that the discovery was not made soon thereafter. Notice of the fact that the application would be made was not given to counsel for plaintiff in error until less than half an hour before the calling of the case for trial. The application was not made until after the case had been announced and called for trial, the impaneling of the jury

commenced, and one juror called into the jury box. It is true that the court offered to adjourn the trial of the cause for 24 hours, if desired by the defense, but the time offered was so unreasonably short there could have been nothing gained by such postponement, and counsel waived no right by declining to accept such adjournment. See *Johnson v. State*, 34 Neb. 257. The importance of such a trial would seem to require the utmost good faith on the part of the prosecution. It is strongly our impression that the knowledge of the step to be taken was unreasonably and unjustly withheld from the defense until the last moment in which the application could be made, if indeed not later than it should have been allowed. This might not of itself demand a reversal of the judgment, but it must be apparent that it was such an irregularity as might work serious injustice to a defendant.

The next contention is that the court erred in overruling certain challenges of jurors for cause, and that, the defendant having exhausted his peremptory challenges, such error should demand the reversal of the judgment. It is unnecessary for us to repeat what is provided by our constitution, and so often declared by all the courts of the land, including this one, that in all criminal cases an accused is entitled to a fair and impartial trial by an impartial jury, and that it is the sworn duty of the courts to see that that right is scrupulously maintained.

A juror by the name of Woorley was called, and, upon being examined by one of the attorneys for the prosecution as to his competency as a juror, testified that he had neither formed nor expressed an opinion as to the guilt or innocence of the accused, and that he could enter upon the trial of the case with his mind free from any opinion upon that subject. Upon being examined by counsel for the defense, he stated that he resided some 30 miles from Ainsworth, had formerly lived in that city, was well acquainted with the deceased, that he was in the city the night of the tragedy, spent the night at the hotel where the accused was boarding, was in the city the 28th, knew of

the arrest of Wilson immediately after it occurred on the morning of the 28th, that he talked with the people that day about the affair, was at the house of deceased, knew all the circumstances of the body being found, how deceased was supposed to have been killed, was to the premises where the tragedy occurred, and had thought about the case in connection with the accused. He was asked the following: "From your knowledge of the facts and the visits you paid to the town, do you say now that you haven't formed any opinion as to the guilt or innocence of the defendant?" His answer was: "Well, none but what it could be changed." Then follows: "Q. Well, it would take some evidence to change your mind, would it not? A. Yes, according to the evidence. Q. You have heard one side of the case? A. That is all. Q. You have heard the state's side? A. That is all. Q. It would take some evidence to cause you to change your mind? A. Yes, sir. Q. As to the guilt or innocence of the defendant? A. Yes." The court then took the juror in hand in quite an extended examination. The answers were apparently candid, but there was little, if anything, brought out showing the exact condition of the juror's mind. When asked if the persons with whom he talked claimed to know the facts, his answer was: "No; they didn't know. They thought it was Mr. Wilson." His answers were generally, "I think so." His attention was not called to his former statement that it would take some evidence to change his mind, and no explanation or modification of those answers was made.

Upon a consideration of all the answers of this juror, we are unanimously of the opinion that the circumstances detailed by him required that the challenge be sustained and that he be excused from the panel. The statement made by him that he had formed an opinion as to the guilt or innocence of the accused, which it would require evidence to remove, when taken in connection with his acquaintance with the deceased, his presence at the home of the deceased, his visit to the spot where the tragedy

occurred, his remaining at the hotel where Wilson was boarding, his intimate knowledge of so many of the facts and of the condition of the minds of those who "thought it was Wilson," failed to show that he was "impartial," and that he would not be influenced by his opinions based upon what he had seen and heard.

The juror Cunningham, when interrogated by counsel for the state, answered questions as follows: "Q. From what you have heard or read, have you formed or expressed an opinion as to the guilt or innocence of the defendant? A. Well, I have to a certain extent; yes, sir. Q. Do you still have that opinion? A. Well, I believe I do. Q. How is that? A. I believe I have; yes, sir. Q. Is that opinion such as it would require evidence to remove if you were selected as a juror in this case? A. Yes, sir; I think it would take some." When interrogated by counsel for the defense, the same state of mind of the juror was clearly shown. He was challenged for cause. The court propounded a number of questions, many of which were quite leading in character, and by the answers to which the former statements of the juror were modified. The challenge of the defense was overruled. Counsel for the accused then said: "'I would like to ask him another question.' By the court: 'Request denied.' Defendant excepts." Just why the request was denied is not shown by the record, and indeed we doubt if any good reason could be given. There was no objection made by counsel for the state, and we are unable to perceive why or how any could have been properly made. In the case of *Basye v. State*, 45 Neb. 261, the subject of the right of a party to propound questions to a jury within reasonable limits is discussed at considerable length, and that right is fully established. This juror was retained and served in the trial of the case, the accused having exhausted his peremptory challenges.

William Renziehausen of Fort Meade, South Dakota, a lieutenant in the United States army, was called as a witness, and, in answer to questions, stated in response that

the accused enlisted in the United States army at Fort Slocum, New York, on the 8th day of January, 1908, by the name of Walter Rifenburg, and had been known by that name ever since; that he was a married man; that his wife was then sitting at the table in the court room (stated by counsel to be a table within the bar of the court) ; that he was given a 10 days' furlough to take effect the 11th day of November, extending to the 20th day of the same month; that he left the post at that time; that witness next saw him on the 13th day of November, 1909, when he came to draw his pay for the month of October, which he did; and that the witness had not seen him since that time until the time of the trial. He was then asked: "Q. Was the defendant ever discharged from the army?" Objection was made to the question as "being an effort on the part of the prosecution to prove that the defendant has committed a crime against the laws of the United States." The court responded: "I will allow it on the theory of his occupation." The witness then answered: "He has never been discharged from service. He deserted." Counsel for the defense moved to strike out the words "he deserted," for the reason as stated above. This motion was sustained, when counsel excepted to the answer of the witness, "as the same tends to prejudice the defendant in his trial in this case." The objection was overruled, and exception taken. This testimony and many other portions of the record show and demonstrate beyond all doubt the existence of a set purpose on the part of the prosecution to discredit the accused in the minds of the jurors. There is no kind of merit in the contention that, under the claim of "occupation," this evidence, offered in chief in the state's case, as it was, was or could have been competent. It is true that the court ordered the words "he deserted" stricken out of the answer of the lieutenant, but there is no suggestion in the record of the ruling that the jury were admonished that the statement should not be considered by them, and all the injury the language could inflict had been accomplished. But back of this is the question

itself. It had been shown, whether correctly or not, that the accused had enlisted in the United States army; that he had been granted a 10 days' furlough; that after his departure under that furlough the commanding officer had not seen him until the opening of the trial. The witness was then asked: "Was the defendant ever discharged from the army?" With a willing witness upon the stand there could be no doubt as to what the answer would be, or what was desired, but the objection was overruled "on the theory of his occupation." Of similar import and purpose was the production of the wife of the man on trial, placing her at a table within the bar, and having this same witness point her out to the jury. It had been shown that accused was a married man; also by the witness, Miss Leads, that he had made an engagement to marry her, but had not done so at the time of his arrest. It is openly charged in the record, the brief and argument, and not denied, that the prosecution caused and procured the lawful wife, the only one, whom it was well known could not be used as a witness against him, to be brought from South Dakota to Ainsworth, placed within the bar, and pointed out and designated, and thus made to appear as a living witness against him. There may be other cases where such things have been attempted, but, if so, we have not found them. This subject of proof of the commission of other offenses was before the court of appeals of the state of New York in *People v. Sharp*, 107 N. Y. 427, 1 Am. St. Rep. 851, where the subject is ably discussed by Judge Danforth, and at page 457 of 107 N. Y. he says: "If Sharp had given evidence of good character, the prosecution might have answered that evidence by proof that his character was bad, but I believe it has not been thought by any judicial tribunal that such evidence could be given in anticipation of proof from the defendant, nor that an issue upon it could be tendered by the prosecution"— citing cases. Indeed, the proposition is so elementary as to require no discussion here. We know of no case where a conviction has been allowed to stand where this salutary

rule has been thus violated.  See *Paulson v. State*, 118 Wis. 89.

These observations apply with equal force to the cross-examination of the accused, who took the witness stand in his own behalf.  He was 23 years of age, and, judging by his answers and language used, is not as well qualified to sustain himself under such an examination as older and more experienced persons might be.  The ordinary and well-established rules of cross-examination appear to have been forgotten or ignored, and many of the minute details of his domestic life were dragged into public view over the objections of his counsel.  At one point in his examination in chief he sought to show that prior to his coming to Ainsworth he had something of a sum of money, some of which at times was deposited in a bank in South Dakota. Whether his statements and claims in this regard were true or not, both his examination in chief and cross-examination demonstrated that he was not entirely clear in his testimony, and that his business capacity was limited.  His deposits in the bank were of comparatively small amounts.  His cross-examination proceeded as follows:  "Q. Then all the money you had in the bank was what you had in the Commercial National Bank in July? A. I think so.  Q. And your account with that bank was closed at that time, wasn't it?  A. I think so.  Q. What is the fact about the matter?  A. I wouldn't say what month it was."  By the court:  "Q. Was your banking business so extensive you couldn't tell that?  A. I couldn't tell the month I drew the last money out of there; no, sir." The cross-examination by counsel for the state then proceeded upon the same subject.  When we consider the great length of the cross-examination, the length of time the accused had been upon the stand, the small amount of deposit which it was claimed had been made, the persistence with which the cross-examining counsel had pressed the subject, in substance, if not in form, repeating his inquiries, and the natural embarrassments under which the witness must have labored, even if he were trying to

tell the truth, we cannot refrain from saying that, under the circumstances, the injection of the one question by the court, evidently sarcastic, was ill-timed and ought not to have been indulged in. The subject of such interferences by the courts has been before this court in *Maynard v. State*, 81 Neb. 301, and in *Fager v. State*, 22 Neb. 332, and in both cases the practice was condemned, except "in case of urgent necessity." This is the rule in this state, and it ought to be adhered to. There was no "urgent necessity," nor indeed any necessity at all, for the interrogatory, and this is especially so since the state was represented by three able counsel, any one of whom was entirely competent to care for and protect the right of the state.

It is insisted with considerable earnestness that the court erred in the admission of evidence over the objections of the accused; that there was error in the instructions, both given and refused; and that the verdict is not sustained by sufficient evidence. Since there will have to be a new trial, these questions will not be examined, as they may not arise in the further progress of the case.

Our constitution provides that in all criminal prosecutions the accused shall have his trial by an impartial jury. This provision necessarily carries with it the assurance of a fair and impartial trial. Without any suggestion on our part as to either the quantity or quality of the evidence we are convinced that neither of these constitutional guaranties has been extended to the accused in this case. Every judicial officer in this state has been sworn to support and protect this constitutional right, and the obligation should be observed at all hazards. None of them can evade it. As emphasizing what we have said and indicating the intense feeling and bitterness of the prosecution, we need but refer to a portion of the argument of one of the state's counsel to the jury. We here copy that portion shown by the record: "If this jury finds this defendant guilty and do not bring in a verdict

recommending the death penalty, no member of the jury need come to me and apologize, or to apologize to any member of the audience." Due objection was made to this highly objectionable language. It was denounced by the court in proper and unmeasured terms, and the jury were strongly and fittingly cautioned against it. The general interest taken in the case, and the trial, in connection with the language used, renders it clear that there was an "audience" present. This court and courts generally throughout this enlightened country, backed up by every text-writer upon the subject, have spoken in emphatic terms as to the duties of a prosecutor. A public prosecutor is declared to be a semijudicial officer. His duties are not to secure convictions, but to present and aid the court and jury in ascertaining and arriving at the truth. There is no demand in any case for browbeating and abusing defendants or witnesses, or intimidating juries. All such conduct should be avoided by prosecutors. Is the public mind inflamed against an accused? If so, seek to allay bitterness of strife and deliberately and dispassionately search for the truth. More than this would be a violation of public duty.

The judgment of the district court must be reversed and the case remanded for further proceedings, which is done.

REVERSED.