(No. 1628, May 12, 1914)

STATE OF NEW MEXICO, Appellee, vs. CLAUD M. COOLEY, Appellant.

### SYLLABUS BY THE COURT.

1. Between the two offenses, murder in the second degree and voluntary manslaughter, the drunkenness of the offender forms no legitimate matter of inquiry; if the killing is unlawful and voluntary, and without deliberate premeditation, the offense is murder in the second degree, malice being implied, unless the provocation were of such character as would reduce the crime to voluntary manslaughter, for which offense a drunken man is equally responsible as a sober one.

P. 102

State v. Cooley, 19 N. M. 91.

2. Where a defendant, charged with first degree murder, relies upon the defense of intoxication for the purpose of reducing the grade of the offense to murder in the second degree, he is not required to establish the fact of his intoxication, or, that at the time he inflicted the fatal injuries he was so deeply intoxicated as to be incapable of forming in his mind a deliberate premeditated design to do the killing, beyond a reasonable doubt. All that he is required to do, is to introduce such evidence as will raise in the minds of the jurors a reasonable doubt as to such facts in order to reduce the grade of the offense to murder in the second degree.

P. 104

3. It is improper for the court, in the trial of a criminal case, to permit the district attorney to ask witnesses if he, the district attorney, did not instruct said witnesses not to talk to anyone about the cause, and if they did not, in violation of such instructions, talk to the attorney for the defendant about the facts in the case; and, where the court erroneously permits such questions to be asked and answered, it should, upon request, instruct the jury that the district attorney had no right to forbid witnesses talking to the attorney for the defendant, about the facts in the case, or to enforce such an order.          P. 108

4. Where mere descriptive language is inadequate to convey to the jury the precise facts, or their bearing on the issue, the description by the witness must of necessity be allowed to be supplemented by his opinion in order to put the jury in a position to make the final decision of the facts. Held, that the court erroneously withdrew from the jury a statement by a witness, that the defendant and deceased appeared to be perfectly friendly toward each other five minutes before the killing.

P. 112

Appeal from District Court, Rio Arriba County; Edmund C. Abbott, Presiding Judge. Reversed and Remanded.

State v. Cooley, 19 N. M. 91.

RENEHAN & WRIGHT, Santa Fe, N. M., for Appellant.

The court erred in submitting to the jury the issue of murder in the first degree. Sec. 1, Chap. 36, L. 1907; 35 Pac. 979; 77 Va. 369; 13 N. M. 300; 16 N. M. 657; Blash Inst. Jur., Sec. 5; 1 Bish. N. Cr. Pro. (4th Ed.), Sec. 980, Par. 2; 63 Ia. 695; 44 Kan. 575; 44 Tex. 299; 37 Kan. 369; 36 Ga. 222; 35 Ark. 284; 30 Cal. 206; 27 S. W. 1113; 15 S. W. 146; 14 S. E. 575; 1 So. 355; 39 U. S. 347; 40 U. S. 981; 2 N. M. 104; 2 N. M. 457; 4 N. M. 164; 6 N. M. 470; 4 N. M. 236; 5 N. M. 34; Whart. on Homicide, Sec. 116; 53 N. Y. 164; 168 N. Y. 568; 13 N. M. 138; 71 N. H. 606; 78 Pa. St. 185.

Testimony. 251 Pa. St. 512; 33 Vt. 125; 61 Vt. 153; 64 Vt. 466; 70 Vt. 288; 68 Me. 279; 17 Cyc. 95-96; 24 Kan. 445; 82 Ala. 25; 107 Ala. 108, 40; 50 Ia. 157; 89 Ia. 109; 84 Vt. 466; 112 N. C. 901; 14 Cent. Digest, Secs. 1037, 1040-1042, 1045; 8 N. M. 528.

Twenty-eighth instruction given by court, on his own motion, is erroneous in that it does not properly apply the law to defense of intoxication, with reference to murder in second degree. 8 N. M. 205; 10 N. M. 120; 14 N. Y. 516; 6 Park. Crim. Rep. 209; 34 Cal. 211; 7 Bush 320; Houst. Crim. Rep. 28; 5 Bush 363; 4 Neb. 277; 84 Ala. 405; 90 Ala. 612; 14 Mich. 401; 11 Humph. 154; 4 Tex. App. 76; Id. 275; 2 Tex. App. 391; 32 Gratt. 929; 27 Cal. 507.

Instruction No. 28, given by court on his own motion, is erroneous for reason that instruction as given required appellant to establish his defense beyond reasonable doubt to justify acquittal of murder in first degree, thereby shifting burden of proof to appellant. Vol. 2, L. of Intox. Liqs., Sec. 1132; Brickwood Sackett Instr., Sec. 2619; 42 Neb. 503; 123 Ind. 347; 23 Neb. 479.

Court erred in refusing to give instruction requested by appellant. 80 Atl. Rep. 15, 16.

Court erred in admitting testimony of witness as to what was said by appellant within short time after homicide. 1 Taylor, Ev. 52; Supra; 129 Ill, 521; 72 Pac. St. 60; 57 N. H. 245; 137 Ill. 602; 4 Eng. L. & Eq. 574.

Court erred in admitting, under objection of appellant, evidence of subsequent events occurring in front of saloon. People vs. Lane, *supra.*

Verdict of jury not based upon evidence, but founded upon passion and prejudice. 25 Fla. 535; Ga. Dec. 150, Pt. 1; 8 Col. 472; 24 Ga. 427; 15 Cent. Digest Crim. L., Secs. 2297-2298; 77 Va. 369.

Court erred in permitting special prosecutor to cross examine witness as to conversation had with witness by special prosecutor preceding trial. 15 Am. Cr. Reps. 175; Whart. Crim. Ev., Secs. 473-477; 17 Tex. Apps. 267; 13 S. W. 670; 65 S. W. 559, 567; 31 N. M. 590; 71 N. H. 606.

Court erred in striking from record affidavit filed in support of motion for new trial. 60 S. W. 562; Hicks vs. State, *supra.*

IRA L. GRIMSHAW, Attorney for Appellee.

Court did not err in submitting issue of murder in first degree to jury. 131 Pac. 489, 491, 492; 125 Pac. 622, 625; 131 Pac. 502, 504; 134 Pac. 213; Secs. 1061, 1062, C. L. 1897; 10 N. M. 120, 133; 1 Underhill C. Ev., Secs. 165, 166; 53 N. Y. 179; 13 N. M. 138, 144.

Court did not err in refusing to permit testimony of opinions of lay witnesses as to insanity of defendant and relation of friendliness between defendant and deceased. 16 N. M. 625; 15 N. M. 157, 127; 131 Pac. 490, 492; 249 Ill. 470, 479; 133 Mo. A. 544-547; 133 Ga. 446-447, 438, 440; 45 Vt. 481; Chamb. L. of M. Ev., p. 2423; Id., p. 2434; 66 Ia. 721; 139 Pa. St. 149; 94 Mo. 255; Id., p. 2423; 53 Wis. 689; 4 Cent. Dict., p. 3614.

No error in giving of 28th instruction nor in limiting it to murder in first degree. Sec. 1815, Vol. 2, Mo. Ann. Stat., 1906; 44 Mo. 234, 235; 59 Mo. 135, 137; 64 Mo. 191, 192, 319.

Intoxication. 2 Woolen & Thornton on Intox. Liq., pp. 27-8; Id. Sec. 1119, p. 2062; 11 Humph. 154; 2 Lee 575.

Instruction No. 28 not erroneous for reason that it required appellant to establish his defense beyond reason-

State v. Cooley, 19 N. M. 91.

able doubt to justify acquittal of first degree murder. 14 N. M. 546-554-5; Whart. Homicide, pp. 805, 806.

Court did not err in refusing to give requested instruction. 15 N. M. 240, 248; 11 N. M. 588, 600.

Court did not err in admitting testimony of witness as to what was said by appellant to him. 1 Whart. C. E. (10th Ed.), Sec .262; Id. pp. 490, 491; 1 Bish. C. P., p. 661; 130 Ala. 83, 88; 84 Ia. 213; 28 Fla. 335.

Court did not err in admitting evidence of subsequent events occurring in front of saloon. 1 Whart. C. E., Sec. 30; 3 Heisk 53-62; 150 U. S. 57-60; Id. pp. 269, 274; Id. Sec. 225.

Court did not err in refusing to permit cross-examination of witness as to appellant's condition subsequent to events occurring in front of saloon. 14 N. M. 546, 554, 555.

No error in permitting cross-examination of witness by special prosecutor. 14 N. M. 288, 292.

No error in striking out affidavit in support of motion for new trial. 60 S. W. 562.

### Reply Brief of Appellant.

Court should not have submitted to jury issue of murder in first degree. 8 N. M. 496.

Action of trial court in refusing to admit certain opinion evidence. Whart. Crim. Ev., Vol. 1; Secs. 458, 460.

Defense of intoxication. 24 Cal., People vs. Sanchez; 14 N. M. 399.

Instruction No. 28 shifted burden to appellant to establish defense of intoxication. 123 Ind. 347.

Court erred in refusing to give instruction requested by appellant. 139 Ind. 206; 142 Ind. 288; 69 Ill. App. 549.

### STATEMENT OF FACTS.

The appellant was indicted at the November, 1912, term of the District Court for Rio Arriba county, for the murder of one Edwin A. Gilliland. The case was tried to a jury at the June, 1913, term, and resulted in a verdict of murder in the first degree. Motion for a new trial

was duly filed, overruled, and the appellant sentenced to be hanged on the 25th day of July, 1913, from which judgment and sentence this appeal is prosecuted.

The homicide occurred on the 22nd day of December, 1911, at the town of Chama, in the County of Rio Arriba, and State of New Mexico; the deceased and the defendant were first cousins, and had practically lived together as members of the same family from earliest childhood. There was only about a month's difference in their ages. On the night before the homicide there had been a "Gun Club Dance" in one of the public halls at Chama, at which guns, cartridge belts, hunting knives, etc., had been used for decorative purposes. The deceased, Gilliland, acting as a member of the decorating committee, had charge of securing the various guns and other weapons used to decorate the hall. The appellant did not go to the dance.

The next day, the 22nd day of December, Gilliland attended to the returning of the various guns used to decorate the hall, and brought a number of them to the room occupied jointly by himself and the appellant.

On the day of the homicide, the appellant, after getting his lunch, went down to the depot with a small nephew to meet an older sister of the appellant's, who was expected to arrive on the afternoon train from Denver. While at the station, waiting for the train, he had several drinks of whiskey from a bottle carried by a man whom he met at the depot  The appellant's sister did not come as expected, and, after the departure of the afternoon trains, the appellant, with several others, including the deceased, Gilliland, made the rounds of the saloons, and spent the balance of the afternoon playing cards and drinking.

According to the testimony, Gilliland drank very little, if anything, during the afternoon, taking cigars instead of liquor. The appellant was drinking whiskey during the entire afternoon. About supper time, the defendant and the deceased left the Navajo saloon to go to supper, but changed their minds and went to the Social Club saloon, where they played a couple of games of pool (the

appellant taking another drink) then left and went back to the Navajo saloon, where they met a friend by the name of Pogue. Gilliland took one drink, and the appellant and the man Pogue took several drinks. At this time the appellant began to feel the effect of the liquor he had taken, but Gilliland was perfectly sober. At about this time the bartender in the Navajo saloon stated to the appellant that he had a box of apples down at the depot which he wanted to get out of the express office before it was locked up. Gilliland and the appellant went down to the depot and succeeded in getting the box of apples, returning with it, the box being carried by Gilliland, to the saloon from which they started. There the appellant had at least three drinks, Gilliland not taking any.

At this point in the proceedings there was some discussion between the appellant, the bartender and a man by the name of Branson, as to the appellant's condition of sobriety. The bartender then started out of the saloon for his home; the deceased following him with the box of apples on his shoulder, and the appellant trailing behind.

Between the hours of 3 o'clock in the afternoon and about 7:30 of the 22nd day of December, 1911, the day of the killing, defendant had taken, in all, fourteen drinks of whiskey of different quantities and one small beer.

The appellant remembered every minute detail of the events occurring during all of that time until he left the saloon enroute home in company with the deceased and another person. From that time on he claims to remember absolutely nothing until he awoke in jail the next morning.

Somewhat later, and about 7 o'clock, one George A. Kelly, a witness for the state, met the appellant with another man, in front of the Social Club saloon, and spoke to them. Cooley answered in Spanish, and the witness then saw that his face was bleeding, and asked him what had happened. He said he had been hit, Cooley talking in Spanish, and the witness not understanding all that was said or by whom Cooley claimed that he had

been hit. The witness, Kelly, with the assistance of one
Joe Martinez, then proceeded to take Cooley to his room.
Both the witness Kelly, and the witness Martinez testified
that Cooley was very drunk, staggering, and had to be
helped down the street. When they arrived at the room,
they found the deceased, Gilliland, in bed asleep.  He
awakened after they had entered, and they all three tried
to induce Cooley to get into bed. Cooley was staggering
around the room, and upset some of the furniture, and
picked up one of the guns in the room. At about this
time, the witness, Kelly, asked Gilliland if there were
any loads in the room for the gun, to which Gilliland
replied in the negative, speaking to Cooley, and telling
him, in a joking way, "Come on to bed, you damn fool!"
and telling Kelly and Martinez that it was all right, that
he would take care of Claud. The witnesses, Kelly and
Martinez, then left the room.

The room occupied by the appellant and the deceased
was in a house owned by the appellant's mother and oc-
cupied by a Mrs. Fitzer, who, together with one Gladys
Bryan, was in the front room, sewing. They testified that
they heard some disturbance, which sounded like furni-
ture being overturned, also some talking, but that the
talking was not particularly loud or boisterous; that this
noise continued for some few moments, when a shot was
heard. Mrs. Fitzer went outside, and met the appellant
coming around the house, on the board walk, with a gun
in his hand. She spoke to him and tried to get him to
return to the room, and not go up town. He refused,
muttering and mumbling and staggering along the walk
with the gun in his hand, muttering, "My God, Maggie,
I have shot Ed."

Mrs. Fitzer was unable to prevent the appellant from
going up town. At this time, the witness, Pound, who
lived nearby, and who had come out of his house to see
what had happened, spoke to the appellant, the appellant
replying (as testified to by the witness Pound) "Get out
of my way, or I will kill you, too." The appellant then
passed on up the street, where he was seen by the witness,
Daggett. The witness, Daggett, saw him coming up the

street, staggering, with a gun in his hand, and muttering to himself. When he reached where Daggett was, he said to the witness, Daggett, "Oh my God, Art!" The witness Daggett testified that the appellant was "kind of crying and swearing" as he staggered up the street. That he kept cursing, didn't seem to know anything until he arrived in front of the saloon known as Boyer's saloon, John Boyer being the stepfather of the appellant. When Cooley got in front of the saloon, Mr. Boyer came out of it. As Boyer stepped out of the saloon, Cooley turned around so that the gun was pointing toward Boyer. Cooley worked the lever of the gun and, by that time, the witness, Daggett, caught hold of the gun and pushed it down. At this time the gun went off. The witness, Daggett, then let go of the gun and took hold of Cooley, and with the assistance of two or three other men, who came up at about that time, took the gun away from Cooley and gave it into the possession of Boyer, who took it into the saloon, worked the lever, and took out an empty shell and one loaded shell. According to the evidence the gun was afterwards delivered to the district attorney.

The witness, Rice, testified that he arrested the appellant at the house of John Boyer; that at the time of the arrest, Cooley was lying on the kitchen floor of the Boyer residence so drunk that he could not get up, in other words, "dead to the world"; that the witness, with the assistance of three other men, managed to get him up and carried him to the jail. This occurred about half past eight.

There was no evidence in the record to show that there had been any trouble or ill feeling between the deceased and the appellant during the entire day, or at any other time. In fact, their relations had been extremely friendly.

The evidence of the State was entirely circumstantial, there being no eye-witnesses to the actual shooting.

At the time Kelly and Martinez took Cooley to his room and left him there, Gilliland was lying upon the back side of the bed asleep. After Kelly and Martinez entered with Cooley he awakened, threw back the covers and invited Cooley to come to bed. During the conver-

sation with Cooley he reached out and picked up a pipe which was lying upon a small stand near the bed.

After the homicide, when other parties entered the room, Gilliland was found lying in practically the same position he had occupied when the witnesses, Kelly and Martinez, left the room before the homicide. The pipe was on the bed near one hand, as though it had fallen from his hand at the instant of the shot, and the other hand was underneath his cheek, supporting the cheek and face. The bed clothes were not in any way disturbed, and were in practically the same condition as when last noticed by the witnesses, Kelly and Martinez. The shot had entered the right eye, while open, passing directly through the head and entering the wall immediately back of where the deceased's head lay upon the pillow. The entire right eyeball was gone, with practically no lacerations of the eye lids.

At the time the witnesses, Kelly and Martinez, brought Cooley to the room, there was no light in the room other than a lantern carried by the witness, Kelly. There was a hand lamp in the room, however, and when Dr. Garthwaite reached the room after the homicide, this lamp was lighted and burning without any chimney. The doctor testified that the body of the deceased lay in a position of rest upon the bed when he saw it; that the bullet from the rifle passed directly through the deceased's head, and into the wall on practically a level line.

A cartridge belt containing cartridges and a hunting knife was found hanging upon the wall almost directly over where the deceased was lying. The room was somewhat in disorder when the doctor entered.

## OPINION.

ROBERTS, C. J.—From the foregoing statement of the facts of this case, it appears that appellant's indulgence in strong drink has resulted in the death of his bosom friend and cousin, and his present unfortunate predicament.

While the law licenses and legitimatizes the sale of intoxicating liquor, for the protection of society from time-

immemorial it has said, that if one voluntarly puts himself into a condition wherein he has no control over his actions, he is responsible for what he does in this condition. So, if a man becomes intoxicated, and while in that condition he commits a crime, he is nevertheless answerable therefor; while this is true, yet intoxication may be shown, where the offense consists of several grades, for the purpose of reducing it from a higher to a lower grade. (Sec. 1120, Woolen's Thornton, on the law of Intoxicating Liquors). At common law, there were no degrees of murder, and the crime was committed, where a person of sound memory and discretion unlawfully killed any reasonable creature in being and in the peace of the commonwealth, with malice aforethought, either express or implied. Kilpatrick vs. Commonwealth, 31 Pa. (7 Casey) 198; 21 Cyc. 703, and cases cited under note 20.

Upon the trial of this case, the court by its 28th instruction instructed the jury as follows:

"The jury is instructed that drunkenness voluntarily produced does not excuse crime. Yet, when a homicide admitting of different degrees of punishment under the law has been committed by a person in such a condition of drunkenness as to render him incapable of a wilful, deliberate and premeditated purpose, the jury cannot find the defendant guilty of murder in the first degree.

"If the jury believe from the evidence and beyond a reasonable doubt that the defendant Claud M. Cooley, killed the deceased, Edwin A. Gilliland, as charged in the indictment, and at the time of such killing the defendant was under the influence of liquor voluntarily taken by him, then said intoxication so produced is in law no excuse for the act done by the defendant, if it was done, unless they believe from the evidence such · intoxication was such as did in fact deprive him at the time of the killing of the mental capacity, to form a malicious, deliberate and premeditated purpose to kill, in which event they may still find the defendant guilty of murder in the second degree, voluntary manslaughter or involuntary manslaughter under the instructions herein given."

Appellant contends that this instruction was erroneous,

in that it did not properly apply the law to the defense of intoxication, with reference to murder in the second degree; his contention being that intoxication is available as a defense, for the purpose of reducing murder in the second degree to voluntary manslaughter. In this, as we shall see, he is mistaken.

Section 1, Chapter 36, S. L. 1907, reads as follows:

"All murder which shall be perpetrated by means of poison or lying in wait, torture, or by any kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration of or attempt to perpetrate any felony, or perpetrated from a deliberate and premeditated design unlawfully and maliciously to affect the death of any human being, or perpetrated by any act greatly dangerous to the lives of others, and indicating a depraved mind regardless of human life, shall be deemed murder in the first degree; and all other kinds of murder shall be deemed murder in the second degree."

Voluntary manslaughter is the unlawful killing of a human being, without malice, upon a sudden quarrel or in the heat of passion.

Intoxication of the defendant, at the time of the killing, while a proper subject of inquiry in determining whether the deliberate premeditation, necessary to constitute murder in the first degree, was present, cannot be said to furnish the provocation required to reduce murder in the second degree to voluntary manslaughter. If, by reason of intoxication, the mind of the defendant was incapable of that cool and deliberate premeditation, necessary to constitute murder in the first degree, but the killing was unlawful, and the act was not done under circumstances which would make the killing only voluntary or involuntary manslaughter, necessarily it would be murder in the second degree, as malice would be implied.

**1** Between the two offenses, murder in the second degree and voluntary manslaughter, the drunkenness of the offender forms no legitimate matter of inquiry; if the killing is unlawful and voluntary, and without deliberate premeditation, the offense is murder in the second degree and malice will be implied from the killing, unless

the provocation were of such a character as would reduce the crime to manslaughter, for which offense a drunken man is equally responsible as a sober one. Wilson vs. State, 60 N. J. L. 171; State of W. Va. vs. Robinson, 20 W. Va. 713; People vs. Rogers, 18 N. Y. 9; State vs. Tatro, 50 Vt. 483.

In the State of Tennessee the statute on murder is identical with that of New Mexico. In the case of Pirtle vs. The State, 9 Humph. 663, the Supreme Court of that state says:

"As between the two offenses of murder in the second degree and manslaughter, the drunkenness of the offender can form no legitimate matter of inquiry; the killing being voluntary, the offense is necessarily murder in the second degree unless the provocation was of such a character as would at common law constitute it manslaughter, and for which latter offense a drunken man is equally responsible as a sober one."

This case is cited with approval by the Supreme Court of California, which state has a similar statute on murder, in the cases of People vs. Belencia, 21 Cal. 546, and People vs. Langton, 67 Cal. 427.

While the instruction quoted was not objectionable, upon the ground urged, it is however erroneous, because it might be reasonably construed as requiring the defendant to establish beyond a reasonable doubt the fact that he was intoxicated, in order to justify an acquittal of murder in the first degree. From a review of the case note accompanying the case of Kelch vs. State, 39 L. R. A. 737, it will be found that five different rules have been established by the courts relative to the measure of proof of insanity in criminal cases, which will justify an acquittal, and necessarily the same rule would apply to the defense of intoxication. These are (a) beyond a reasonable doubt; (b) to the satisfaction of the jury; (c) by a preponderance of the evidence; (e) clearly proved, and (f) where a reasonable, well founded doubt is raised by the evidence, as to the sanity of the defendant, he is entitled to the benefit of such doubt. The latter is the pre-

dominating rule in American jurisprudence, and was followed by the Territorial Supreme Court in the case of Territory vs. McNabb, 16 N. M. 625. We believe the same rule should apply to the defense of intoxication, and that all that should be required of the defendant is, to introduce such evidence of the fact, that at the time he inflicted the fatal injuries, he was so deeply intoxicated as to be incapable of forming in his mind a deliberate premeditated design to do the killing, as will raise in the minds of the jurors a reasonable doubt as to such fact, in order to reduce the grade of the offense to murder in the second degree. An excellent instruction on the subject will be found in the case of Maynard vs. State, 81 Neb. 301, 116 N. W. 53.

Upon the trial of the case, the court permitted Mr. Crist, an attorney appointed by the court as special deputy prosecutor, to ask certain witnesses for the state, who had given testimony favorable to the accused, if they had not talked with Mr. Renehan, one of the attorneys for the defendant, relative to the facts in the case; and upon receiving an affirmative answer further permitted him, over objection, to ask such witnesses if he, Crist, had not theretofore instructed them not to talk to any one about the case without his permission, and if they had not violated such instructions by talking to Mr. Renehan; in answer to which questions such witnesses admitted that they had violated his instructions in that regard. In order to cure any prejudice which might have resulted to the defendant by reason of the inference which might reasonably have been drawn by the jury from such evidence, that defendant's attorney had acted improperly in interviewing the state's witnesses, and that such witnesses had violated an injunction, which the state's attorney was authorized to impose upon them, the defendant asked the court to instruct the jury as follows:

"There has been some evidence offered in this case tending to show that the acting district attorney, or special prosecutor, Mr. Crist, instructed certain witnesses not to converse about the case with any other person than him.

State v. Cooley, 19 N. M. 91.

There was no authority in the district attorney to make such request or to enforce obedience to it, especially where it included defendant's counsel. Attorneys engaged in the defense of important criminal trials have the right to ascertain by proper and legitimate means the nature, strength and credibility of the testimony to be offered in the case, so long as they do not, by word or act, attempt in any manner to influence a witness to conceal, modify or change his testimony from that which is absolutely true. The attorney for the defendant was authorized by his professional duty to interview the witnesses in this case who had been summoned by the State, particularly since the witnesses for the one side were the witnesses for the other side."

The court refused to give the instruction, to which refusal the defendant excepted. Appellant contends that the action of the special prosecutor, in view of the court's refusal to instruct as to the right of counsel for the defendant to interview all the witnesses in the case, both for the state and the defendant, necessarily must have prejudiced the rights of the defendant.

The attorney for the defendant had the right to ascertain by proper and legitimate means the facts in the case. With such end in view, he had the right to interview the witnesses, or the people whom he supposed were witnesses to the occurrence, or cognizant of facts material to the case. Of course he would have no right to attempt to cause such witnesses to color their testimony, or to conceal, modify or change the same from that which was absolutely true. As was said by the Territorial Supreme Court in the case "In Re Catron," 8 N M. 253:

"We know of no rule of morals or professional ethics which is opposed to this view. If this is not allowed, then you break down the barrier which the law and the courts have erected as a shield to protect the lives and liberty of the citizens from what might prove an unjust and designing prosecution. We do not wish to be understood as in the slightest degree countenancing any conduct on the part of any attorney in attempting in any manner to in-

fluence a witness to conceal, change, or in any manner give improper testimony under any circumstances. Such an act, when established, should meet with condemnation by the bar, and should be visited with disbarment by the court. We discover, however, no unprofessional conduct in the respondent in his simply visiting the witness to honestly ascertain what would be his testimony, so long as he did not in any way attempt to influence him to conceal, falsely change, or modify his testimony."

Were this not the rule, then the state would be able to absolutely preclude the defendant from preparing intelligently to present his defense to the court and jury, by subpoenaing as its witnesses all the witnesses to the transaction, and thereby preclude the defendant's attorney from interviewing them. Witnesses are supposed to be impartial, in all cases, and to be actuated with a desire to tell only the truth. So long as no attempt is made to cause them to discolor or change their testimony, from the actual facts in the case, an attorney is acting properly and legitimately when he endeavors to ascertain their knowledge of the case. As was said by the Supreme Court of Rhode Island, in the case of State vs. Papa, 32 R. I. 453; 80 Atl. Rep. 12.

"The attorney for the defendant not only had the right, but it was his plain duty towards his client, to fully investigate the case and to interview and examine as many as possible of the eye-witnesses to the assault in question, together with any other persons who might be able to assist him in ascertaining the truth concerning the event in controversy. Witnesses are not parties and should not be partisans. They do not belong to either side of the controversy. They may be summoned by one or the other or both, but are not retained by either. It would be a most unfortunate condition of affairs if a party to a suit, civil or criminal, should be permitted to monopolize the sources of evidence applicable to the case to use or not as might be deemed most advantageous. Such a proceeding in a criminal case would violate the provisions of the constitution of this state (Article 1, Sec. 10) which pro-

vides, that 'in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining them in his favor, to have the assistance of counsel in his defense, and shall be at liberty to speak for himself, nor shall he be deprived of life, liberty, or property, unless by the judgment of his peers, or the law of the land."

"The defendant, therefore, has the constitutional right to have compulsory process for obtaining witnesses to testify in his behalf. He has also the right, either personally or by attorney, to ascertain what their testimony will be. But in the interviews with and examination of witnesses, out of court, and before the trial of the case, the examiner, whoever he may be, layman or lawyer, must exercise the utmost care and caution to extract and not to inject information, and by all means to resist the temptation to influence or bias the testimony of the witnesses. If in any case the claim should be made that a party has misconducted himself in this respect, the matter should be left to the determination of the jury, as affecting the question of his guilt or innocence of the crime charged. If it was charged that an attorney had been guilty of such impropriety, it would constitute cause for the disciplinary action of the court, and should not be submitted to the jury, unless it appeared that it was done with the knowledge and consent of his client in which case the matter should be left to the determination of the jury. The court, however, should refrain from the use of expressions which are likely to give the jury the impression that the court has prejudged the matter. The expressions of the court in this case, above quoted, beginning, 'It is unfortunate that the defendant's attorney should feel under any obligation to send for one of the witnesses for the state,' and ending 'That is an unfortunate circumstance to say the least,' are subject to this criticism. This exception must therefore be sustained."

The court properly permitted the state to ask the wit-

nesses if they had talked to any one about the case, but should not have allowed the special prosecutor to ask if he had not instructed such witnesses not to talk to any one else about the case, and if they had not violated his instructions in talking to Mr. Renehan. By permitting such questions to be answered, the jury would naturally be led to believe that the witnesses had been guilty of impropriety, to say the least, in talking to the attorney for the defendant, in violation of the orders of the state's attorney; and, likewise, must have been also impressed with the idea that the attorney for the defendant was reprehensible in talking to such witnesses under the circumstances. Having permitted the evidence to go to the jury, over objection, the court should have given the requested instruction.

It is next contended that the court erred in refusing to permit lay witnesses to give opinion evidence as to the insanity of the defendant, and that it likewise erred in not permitting certain witnesses to express an opinion as to whether the relations between the deceased and the defendant appeared to be friendly, or otherwise, a few minutes before the homicide.

The right of a lay witness, to give in evidence his opinion, as to the sanity or insanity of a party, is fully discussed in the case of Territory vs. McNabb, 16 N. M. 625. We are of the opinion that the rule therein announced is the correct rule on the subject, and further discussion would be fruitless.

Kelly, a witness for the State, had testified that he met the defendant on the village street, and that he, in company with another witness, named Martinez, took him to his room, which was used by both the defendant and the deceased. That the defendant was very much intoxicated; that when they entered the room with the defendant, the deceased was in bed. After detailing fully all that was done and said in the room, by all the parties, he was asked to "proceed and describe the manner in which Cooley and Gilliland addressed each other in anything that they said, and describe their acts toward each other, if

there were any acts, with such detail as you can give them, for the jurors' information." In response to the question the witness proceeded to describe the appearance, acts and conduct of the parties toward each other, and concluded: "They both seemed to be, on my leaving the room, perfectly friendly." This portion of the answer, over objection of the defendant, upon the motion of the State, was withdrawn from the jury.

It was of the utmost importance to the defendant that the jury should be fully acquainted with the relations existing between himself and the deceased at the time referred to by the witness, for the killing took place within five minutes after the witness had left the room. If the relations between the parties at that time was friendly, it would have been a strong circumstance, in his favor, militating against that deliberate premeditated malice, essential to first degree murder. It would be indeed a very difficult matter for a witness adequately, by mere descriptive language, to convey to the jury the fact of the friendly relations existing between parties by a mere recital of their acts and words. Two men meet, in the presence of a witness. There may not be a word spoken or an act done, which can be described in words, which would indicate unfriendliness; still the witness may observe from the appearance and expression of the face and eyes and the general demeanor of the parties, which he can not portray with words, that an unfriendly feeling exists between the two men. If he cannot give to the jury his opinion as to the relation of the parties toward each other, the jury would not be able to form an intelligent opinion thereon.

In the case of Commonwealth vs. Eyler, 217 Pa. 512, 10 A. & E. Ann. Cas. 786, the court say:

"The rule as to the admissibility of opinions of non-expert witnesses was settled in the leading case of Graham vs. Pennsylvania Co., 139 Pa. St. 149, 21 Atl. Rep. 151: 'Where mere descriptive language is inadequate to convey to the jury the precise facts or their bearing on the issue, the description by the witness must of necessity be

allowed to be supplemented by his opinion in order to put the jury in position to make the final decision of the fact,' and quoting from Com. vs. Sturtivant, 117 Mass. 122: 'The exception includes the evidence of common observers testifying to the results of their observations made at the time, in regard to common appearances or facts, and a condition of things which cannot be reproduced and made palpable to a jury.' "

Quoting further from Graham vs. Pennsylvania Co., it is said:

"In several classes of questions the line between the witness's judgment or opinion and his affirmation of a fact is so indistinct that it cannot be marked out in practice. Such are questions of identity of persons or things, of the lapse of time, of comparative shape or color or sound, of expression and through it of meaning, etc. In all of these, however positively the witness may affirm facts, what he says is after all largely his opinion, but so blended with knowledge and recollection that the line where opinion ends and fact begins cannot be distinguished."

The case of State vs. Marsh and Buzzell was a trial of a wife and her paramour for the murder of a husband.

"The witness, F. F. White, was asked what he observed in respect to the conduct of the respondents toward each other on an occasion, the day after the death of the deceased, and answered: 'I observed they were very intimate.' To this answer the respondents excepted, for that it was not responsive to the question, and, as given, was simply an expression of the witness's opinion. The court then had the witness state the acts which he observed which gave him the impression that they were very intimate. There was no error in this action of the court. The rule governing the admission of this class of evidence is well stated by Peck, J., in Bates vs. Sharon, 45 Vt. 481, as follows: 'Where facts are of such a character as to be incapable of being presented with their proper force to anyone but the observer himself, so as to enable the trier to draw a correct or intelligent conclusion from

them without the aid of the judgment or opinion of the witness who had the benefit of personal observation, he is allowed, to a certain extent, to add his conclusion, judgment or opinion.' This is given as an exception to the general rule, that the opinion of non-expert witnesses is inadmissible." State vs. Marsh, etc., 70 Vt. 288.

In Smith vs. Miles, 15 Vt. 245, at 249, the case being a trial for slander, the court, speaking of the importance of the sense in which the alleged slanderous words were spoken, said:

"Hence those who see or hear those incidents are permitted to state the impression made upon their minds at the time, on the same ground, I apprehend, that any witness is allowed to state appearances, in any case, where such appearances are, in their nature, incapable of exact and minute description; e. g. the health or sanity of a person, at a particular time, in regard to which even unprofessional witnesses are permitted to speak of opinions formed at the time from indications and appearances not susceptible of description."

"A witness was allowed to state that at a certain time, the fact being material, the plaintiff was intoxicated. This was objected to as being the expression of the opinion of a witness. Such testimony was directly decided to have been admissible in People vs. Eastwood, 14 N. Y. 562. In a certain sense, a vast deal of testimony is but statements of opinion. But it is not opinion in an objectionable sense. It is every day practice for witnesses to swear to such facts as the quantity, weight, size and dimension of a thing, to heat and cold, age, sickness and health, and many other matters of the kind. In such cases, witnesses do not express an opinion founded on hearsay or the judgment of other men. It is not an opinion based upon facts recited and sworn to by other witnesses. It is their own judgment, based upon facts within their own observation. It is so far as such a thing can be, knowledge of their own. It is an opinion which combines many facts without specifying them. It has been described as 'an 'abbreviation of facts,' 'a shorthand rendering of facts.'

It is an inference equivalent to a specification of the facts. The witness in effect describes the facts when he gives his opinion. It is his way of stating them. Such testimony is admitted from necessity. A witness can seldom give in detail all the points and particles which go to make up his belief, but he can characterize them." Stacy vs. Port-- land Pub. Co., 68 Me. 279.

In the case of Blake vs. People, 73 N. Y. 586, a witness for the state was asked "Whether the hold of the prisoner and the deceased was a friendly grasp." He answered he did not know; he believed it was a friendly grasp. Held, to be within the rule in People vs. Eastwood (4 Kern 562), where a witness was asked if, in his judgment, a person was intoxicated.

"The witness may summarize human conduct by stating the effect which it produced on his mind, its manner, and he may state its object, and the emotions, influences, or other causes from which he infers it took place, and what relations they indicate between two persons." 17 Cyc. 95-96 and cases cited.

"On the trial of an indictment for murder, a witness may be asked his opinion as to whether the defendant and the deceased were on good terms or not." State vs. Stack-house, 24 Kans. 445.

"Where anger or bad temper of a party is material to the issue, a witness may be allowed to testify that the party appeared to be angry, as anger or bad temper can be proved in no other way." Jenkins vs. State, 82 Ala. 25.

On a trial for murder, a woman who was sitting in deceased's lap was properly permitted to testify whether defendant appeared to be mad, or to be in fun, when he approached deceased, and declared his intention of killing him. State vs. Edwards, 112 N. C. 901. The court should not have withdrawn from the jury the answer in question.

Complaint is also made as to rulings of the court in excluding other similar evidence offered by defendant. What we have said above, however, will be a sufficient guide to obviate a recurrence of error in a second trial of

this case, in this regard. Appellant argues, with great plausibility, that the facts are insufficient to sustain a conviction of murder in the first degree. While we entertain grave doubts as to whether the facts in this case, as shown by the record before us, warranted the jury in returning a first degree verdict, still, as the cause must be reversed for other reasons, it is not necessary for us to discuss the facts.

Other grounds of error are argued by appellant's counsel, but as the cause must be reversed and a new trial awarded, we will not consider the remaining assignments, as the questions presented are either well settled by adjudications of our own court, or will probably not arise upon a subsequent trial.

For the reasons stated, the cause is reversed and remanded, with instructions to the district court to award a new trial, and it is so ordered.

### SYLLABUS BY THE COURT.

